Jeffrey T. NEEDELS and Debra Lyn Piatt, Respondents,

v.

Michael ROBERTS,-Appellant.

No. WD 48012.

Missouri Court of Appeals, Western District.

April 5, 1994.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 31, 1994.

Application to Transfer Denied Aug. 15, 1994.

Timothy J. Murphy, Kansas City, for appellant.

Philip F. Cardarella, Kansas City, for respondents.

Before ULRICH, P.J., and BRECKENRIDGE and SPINDEN, JJ.

SPINDEN, Judge.

This appeal arises out of a will contest in which a testator's children challenge a will giving all of the testator's estate to his stepson. A jury decided that the testator's wife had unduly influenced the testator with threats of divorce to disinherit his children and to leave all of his estate to her son, Michael Roberts. Roberts appeals, but we affirm the trial court's judgment.

## I. Facts

Jeffrey T. Needels and Debra Lyn Piatt contest the will of their father, Orval T. Needels, Jr., as being unduly influenced by their father's second wife. Their father was married to the childrens' mother, Roseanne Mapes,[1] for 20 years before the couple divorced in 1979.

Orval Needels was overwrought about the divorce. Briefly before Mapes filed for divorce, he attempted suicide. About a year after the divorce, he attempted suicide again. Mapes testified at trial that the reason for both attempts was his "fear of divorce." She and the children testified that Orval Needels continued to show concern for them after the divorce.

In 1982, Orval Needels married Wanda Roberts, a long-time customer of Orval Needels' veterinary services and a family friend. His second wife was aware of his first suicide attempt and of his mental state during his divorce of Mapes. About a year after remarrying, Orval Needels executed a new will. Although he often consulted with lawyers about business affairs, he apparently drew up the new will without lawyer assistance. The will bequeathed all of his property to Wanda Roberts Needels and made her the executrix of his estate. It provided that if she died before he did, her son Michael Roberts was to receive all of his property and would serve as his estate's executor. The will said, "Having my children, Jeffrey T. Needels and Debra Lyn Needels in mind I make no provision for them in this my Last Will."

In 1984, Orval Needels expanded his veterinary clinic to include pet grooming and the sale of pet supplies. Wanda Needels managed this part of the business until she was diagnosed as suffering terminal cancer. She relinquished management of the grooming and supply business to her son in 1989. Michael Roberts was still managing the business at the time of trial.

Jeffrey Needels began working at the veterinary clinic in July 1989. His father announced to a partner in the veterinary practice and to other employees that Jeffrey Needels would be an office worker. Orval Needels intended for his son to become office manager eventually, but that did not occur. Jeffrey Needels quit working in the clinic in

---

1. She remarried in 1991, and her married name is Mapes. The record does not inform us of her maiden name. For the reader's ease, we refer to her by her current name.

early 1990 after disputes erupted with other employees.

Jeffrey Needels testified that his father was concerned that Michael Roberts was not reporting all of the pet supply business proceeds. He said that he and his father discovered a 10 percent discrepancy between receipts and the business records and that his father asked him to have an attorney request an accounting by Michael Roberts. He identified a letter dated October 18, 1989, as the letter sent by the attorney to Michael Roberts, but the letter said nothing about a discrepancy. It said that Orval Needels and his partner wanted "to formalize the relationship" with the business Roberts managed. The letter suggested that either space in the clinic be leased to Roberts or that the business be sold to him. Jeffrey Needels said that, after Roberts received the letter, Roberts confronted him and said, as he grabbed Needels' arm, "You think you can get rid of me this easy? Your father is so afraid of divorce that my mother can get him to do anything, all she had to do was say the word 'divorce' and he signed the Will. I'll be here a long time after you're gone."

On June 25, 1990, while his wife was near death, Orval Needels went to the office of his attorney, Sam Zollicker, to discuss his will. During the meeting Zollicker prepared a memorandum of their discussion. The memo indicated that Needels wanted to change his will so that all his property went to his children, except for property at 10813 East 40 Highway which he wanted to give to his wife's family. The memorandum indicated that he wanted his residence to go to his children, but "she would want to have it go to her [children]." [2] The attorney asked him to bring legal descriptions of his property so the will could be drafted; he never did.

Wanda Needels died on July 17, 1990. In the same month, Orval Needels was diagnosed as suffering brain cancer. On August 1, 1990, he named his sister, Karoli Montgomery, as his attorney-in-fact to help manage his affairs.

Montgomery discussed her brother's will with him to make certain that he wanted to disinherit his children. She said that he acknowledged that he had prepared the will, that he understood its terms and that he agreed "in general" that it expressed his desires.

On August 25, 1990, Jeffrey Needels and Montgomery told Zollicker that Orval Needels wanted to change his will. At their request, Zollicker called Orval Needels at his hospital room. Orval Needels agreed to discuss the will with Zollicker.

The same day, Zollicker discussed the will with Orval Needels in Needels' hospital room. Needels appeared to be confused. At times, he did not remember that his wife had died. He was aware that the will left all of his estate to Michael Roberts. He told Zollicker that revoking the will would be "chicken shit" and decided against revoking it.

In October 1990, Montgomery asked Zollicker to meet with Orval Needels again. Zollicker declined after doctors told him that Needels was not capable of understanding any legal document. Needels' health did not improve, and he died on September 11, 1991.

## II. Points on Appeal

Michael Roberts makes four contentions of error: (1) the trial court erred in admitting into evidence his statement to Jeffrey Needels during their confrontation in late 1989; (2) the trial court erred in admitting Zollicker's testimony concerning tentative estate plans; (3) the trial court erroneously denied his motion for directed verdict at the close of the evidence because the Needels' evidence was insufficient; and (4) the trial court should have directed a verdict in his favor because the evidence was insufficient to show "that the specific provision [Orval Needels] included in the instrument he executed as his last will and testament, naming the appellant as his contingent beneficiary, was the result of undue influence by ... Wanda Needels."

---

**2.** Wanda Needels had a second son, Patrick, for whom she made no provision in her will. However, in July 1990, shortly before Wanda Needels died, she and Orval Needels signed the deed of the house at 10813 East 40 Highway over to Patrick.

## A.

■ Roberts complains that the trial court erred in admitting Jeffrey Needels' testimony that Roberts said to him, "Your father is so afraid of divorce that my mother can get him to do anything, all she had to do was say the word 'divorce' and he signed the Will." Roberts complains that the evidence was inadmissible hearsay and had no probative value.

■ The trial court properly admitted the statement. Contrary to the general rule that admissions by party opponents are admissible, a legatee's out-of-court statement is not admissible in a will contest. *Look v. French*, 346 Mo. 972, 144 S.W.2d 128, 131 (1940); *Kaiser v. Pearl*, 670 S.W.2d 915, 920 (Mo. App.1984). An exception is made, however, when only one legatee is involved in a will contest. "The purpose for not admitting extra-judicial statements of one where there are multiple beneficiaries is so their rights will not be adversely affected. However, where there is only one legatee that would be affected, ... this rule does not apply." *Kaiser, id.* at 920–21 (citing *Look, id.*, and *Schierbaum v. Schemme*, 157 Mo. 1, 57 S.W. 526, 534 (1900)). Hence, because Roberts was the only legatee, his statements were admissible under the *Look* exception.

The statement was sufficiently probative to be admissible. "Because of the difficulty of proof of undue influence, a wide range of circumstantial evidence is admissible to establish that fact. Of course, evidence concerning the mental condition of the testator, the power of the proponent to influence that testator, and the opportunity to do so is competent." 5 FRANCIS M. HANNA AND JOHN A. BORRON, JR., MISSOURI PRACTICE: PROBATE LAW AND PRACTICE § 130 (2d ed. 1988).[3] The statement was probative in determining Orval Needels' mental condition, Wanda Needels power to influence her husband, and her opportunity to do so.

## B.

■ Roberts complains that the trial court erred in admitting Zollicker's testimony concerning Orval Needels' desired disposition of his property as expressed during Needels' meetings with Zollicker. The contestants first offered Zollicker's testimony, but the trial court sustained Roberts' objection on the ground that Needels' desires in 1990 were not relevant to whether undue influence had occurred in 1983. Roberts recalled Zollicker as a witness. During the contestants' cross-examination of him, the trial court overruled Roberts' objection. We concur with the trial court's rulings.

Roberts opened the door to the testimony by recalling Zollicker and eliciting evidence concerning his conversations with Needels. Roberts asked Zollicker about their first meeting on June 25, 1990:

Q. Did you discuss with him his understanding of what the terms of [the August 1983] Will were?

A. Yes, very generally.

Q. Did you make a determination as to whether he had an understanding of the terms generally of the August 1983 Will?

A. Yes.

Q. And what was that determination of his understanding?

A. In very general terms, the Will left his property to his spouse if she was living, and then if not, to his step-son.

Roberts then asked about Zollicker's meeting with Needels on August 25, 1990, in Needels' hospital room:

Q. Did you again discuss with your client the terms of the 1983 Will?

A. Yes, I did.

. . . .

Q. All right. Would you tell us what opinion you formed about his understanding?

A. Well, in June he had indicated that the Will left everything to his spouse; that the stepson, Michael, was the contingent beneficiary. When I met with him in Au-

---

**3.** Professor Hanna and Judge Borron cite *Disbrow v. Boehmer*, 711 S.W.2d 917 (Mo.App. 1986); *Canty v. Halpin*, 294 Mo. 96, 242 S.W. 94 (1922); *Bushman v. Barlow*, 316 Mo. 916, 292 S.W. 1039 (1927) (overruled on other grounds); *Denny v. Hicks*, 222 Mo.App. 1206, 2 S.W.2d 139 (1928) (overruled on other grounds); *Hammonds v. Hammonds*, 297 S.W.2d 391 (Mo.1957).

gust, as I understand, his spouse was deceased, but he was confused about that, in my conversations with him, so I don't know whether he believed the Will still left the property to her or to Michael. He, on *occasion, did not remember that his spouse* was deceased, but he still seemed to have the same understanding as to what the Will did, but he didn't seem to understand the facts of his family situation, or that the spouse was deceased.

Q. Did you specifically discuss with him the fact that the Will would leave the estate to Michael under the conditions as they then existed?

A. Yes, I did.

Q. And did you also discuss with him the consequences of revoking the Will?

A. Yes, I did.

. . . .

Q. Did he use the term, I think you suggested in the deposition that he thought would be the effect of revoking the Will.

A. In his words, he said he thought to revoke the Will would be, quote, "chicken shit", end quote.

. . . .

Q. Were you given any specific instructions by Dr. Needels at the conclusion of that meeting?

A. I asked him what he wanted me to do with the original Will, whether he wanted me to keep it. I think I said "or what", and he asked me, he told me to keep it, and if we did a new estate plan, I think his words were we would "deep-six it" at that time.

When the contestants inquired in cross-examination into details of the meetings, Roberts objected. The trial court correctly responded, "Very frankly, I think on your direct examination you've opened the thing pretty much wide open[.]"

The contestants had a right to cross-examine Zollicker about the matters to which he testified on direct examination. Section 491.070, RSMo 1986, provides, "A party to a cause, civil or criminal, against whom a witness has been called and given some evidence, shall be entitled to cross-examine said

witness . . . on the entire case[.]" *See Louis Steinbaum Real Estate Company v. Maltz,* 247 S.W.2d 652, 655 (Mo.1952), and *Henry v. Impact Management, Inc.,* 808 S.W.2d 396, 399 (Mo.App.1991). After Roberts elicited Zollicker's opinions based on his conversations with Needels, the contestants were entitled to ask about details of those conversations to test those opinions.

## C.

In his last two points, Roberts challenges the sufficiency of the contestants' evidence and he contends that the trial court erred in overruling his motion for a directed verdict. The trial court did not err in overruling the motion; the contestants made a submissible, circumstantial evidence case.

Direct evidence of undue influence is uncommon. Given its nature, undue influence rarely "proclaim[s] itself 'from the housetops, but is hidden like a candle beneath a bushel, and concealed like fraud and deception, only appearing through careless and unguarded openings.'" HANNA AND BORRON, *id.* at § 127 (the quotation's source is not disclosed).

■ In determining whether the contestants made a submissible case, we accept their evidence as true and disregard Roberts' evidence, except to the extent it aided the contestants' case. We give the contestants all reasonable, favorable inferences from the whole evidence. We examine the evidence in its entirety and look at isolated parts only in relation to the whole. *Rhoades v. Chambers,* 759 S.W.2d 398, 402–03 (Mo.App.1988).

■ To show undue influence, the contestants must establish four basic elements: (1) an influenceable testator; (2) the influencer had an opportunity to influence unduly; (3) the influencer had a motive and disposition to exert undue influence; and (4) the influence produced a result. HANNA AND BORRON, *id.* at § 123.

■ The contestants established that Orval Needels was influenceable. Although he was a veterinarian and experienced in business matters, he demonstrated an intense fear of divorce. He responded to his first wife's decision to divorce him by twice at-

tempting suicide. He expressed to his son that he was not following his own preferences in matters of his estate because of fear that his second wife would divorce him.

As his wife, Wanda Needels had opportunity to influence Orval Needels. As a long-time family friend, she was aware of his attempted suicides and the emotional trauma his divorce had caused him.

■ Orval Needels' bequest of his entire estate to a step-son and his disinheritance of his children was an unnatural disposition—a bequest in which a testator, without apparent reason, leaves his or her estate, or a large portion of it, to nonblood heirs and excludes the natural objects of his or her bounty. *See* BLACK'S LAW DICTIONARY 1538 (6th ed. 1990) (defining unnatural will). The natural objects of a testator's bounty, at a minimum, include those individuals described in § 474.-010, RSMo 1986, the intestate succession statute.[4] *Norris v. Bristow,* 358 Mo. 1177, 219 S.W.2d 367, 370 (1949). Although an unnatural disposition is not sufficient in itself to support a finding of undue influence, such evidence is an indication that influence existed which was undue and that the testator executed his or her will as a result of the influence. *Wilhoit v. Fite,* 341 S.W.2d 806, 814 (Mo.1960); *Salisbury v. Gardner,* 515 S.W.2d 881, 886 (Mo.App.1974). The record is void of any explanation of why Orval Needels would so prefer his step-son in 1983, one year after marrying his mother, that he would leave his entire estate to his step-son and disinherit his children. This unnatural disposition and the other evidence presented by contestants made a submissible case.

Appellant relies heavily on *Morse v. Volz,* 808 S.W.2d 424 (Mo.App.1991), in arguing that contestants did not make a submissible case. The testator in that case disinherited his natural son in favor of his second wife. The court found no undue influence. It emphasized the difficulty in finding undue influence when property is left to a wife: "[T]he fact that a husband bequeaths all of his property to his wife to the exclusion of his children by a former marriage is not an

unnatural disposition." *Morse,* 808 S.W.2d at 433. The court also pointed out that the will was written after the testator's son "renounced his filiation[.]" *Id.*

In this case, had Wanda Needels been alive to receive Orval Needels' property as the primary beneficiary, rather than it's going to her son as contingent beneficiary, or, had some rational explanation supported the disinheritance of Orval Needels' children and his sudden preference for a step-son, we would reach the same conclusion as the *Morse* court. *Morse* is not applicable to the facts in the present case.

For the reasons stated, we affirm the judgment of the trial court.

All concur.

---

**4.** Those individuals are a surviving spouse, children, parents, brothers and sisters, grandparents,

and uncles and aunts.