**Sammy Lee ROBERTSON and Edna L. Bennett, Individually and as Personal Representatives of the Estate of Sarah Robertson, Deceased, Plaintiffs–Appellants,**

v.

**Donald ROBERTSON, Defendant–Respondent.**

**No. 22621.**

Missouri Court of Appeals, Southern District, Division Two.

April 24, 2000.

at 98–99.

John L. Woodward, Stephen K. Paulus, Woodward, Evans and Paulus, L.L.C., Cuba, for Appellant.

Edward D. Hoertel, Hoertel & Hoertel, Rolla, for Respondent.

PHILLIP R. GARRISON, Chief Judge.

Sammy Lee Robertson and Edna 'L. Bennett (referred to herein as "Sammy," "Edna," or collectively as "Plaintiffs") filed suit to set aside a deed executed by their mother conveying a family farm to Donald Robertson ("Defendant"). They alleged that when she signed the deed, their mother was of unsound mind and lacked the requisite mental capacity, that her health and mental condition made her susceptible to being easily influenced, and that she was under the domination and influence of Defendant. The trial court found in favor of Defendant. Plaintiffs appeal.

■■■■ This case, being tried without a jury, brings our review within Rule 73.01(c).[1] The judgment is to be affirmed unless it is not supported by substantial evidence, unless it is against the weight of the evidence, unless it erroneously declares the law or unless it erroneously applies the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). A judgment is presumed correct, and the appellant has the burden of proving it erroneous. *Wingate v. Griffin,* 610 S.W.2d 417, 419 (Mo.App. W.D.1980). We defer to the trial court's assessment of credibility. *Id.* A suit to set aside a deed is an extraordinary proceeding in equity requiring that the evidence in support of that result must be clear, cogent and convincing. *Id.*

Plaintiffs are the adult children of Sarah V. Robertson ("Sarah"), deceased. They had each moved from the area of their childhood home in Maries County in the 1960s, with Sammy living in south Missouri, and Edna living in South Carolina. Their father, Samuel, died in 1976, and Sarah remained on the family farm which consisted of 495 acres in rural Maries County. When her husband died, Sarah learned to drive and took over the farm operation which included a cattle operation. In approximately 1987, when Sarah was 85 years old, she began employing the services of Defendant (who was related to her husband's family through marriage) to assist with the work on the farm. Initially, this included feeding the cattle, but it eventually expanded to assisting Sarah in many other ways, including driving her places and helping her manage her money. Defendant was initially paid $200 per month by Sarah. That later increased to $300 per month, plus $5 per hour for building fence, and one-half of the gross proceeds from cattle sales.

Defendant, apparently with the knowledge and consent of Plaintiffs, became more involved in Sarah's life over the last several years prior to her death. He eventually helped her manage her checking account, pay bills, and transported her when she needed to go places. The evidence indicated that Sarah was devoted to her farm and cattle, and wanted to live there as long as possible. She often expressed the thought that it was Defendant's assistance that permitted her to remain on the farm.

In September 1992, Sarah executed a quit claim deed in favor of Defendant in which she reserved to herself the right to use, occupy, collect the rents and income from, and to mortgage, sell or in any manner dispose of the property during her lifetime. Sammy filed a petition seeking the appointment of a guardian and conservator for Sarah in December 1995. That petition followed a fall sustained by Sarah which resulted in her hospitalization in November 1995 and subsequent admission to a nursing home, at which time her doctor wrote the probate division of the circuit court indicating that she had been diagnosed as having advanced stages of dementia with significant cognitive impair-

---

1. All references to rules are to Missouri Rules of Civil Procedure (1999) and all references to statutes are to RSMo 1994, unless otherwise indicated. The provision of Rule 73.01(c) applicable to this case now appears in Rule 84.13(d), Missouri Rules of Civil Procedure (2000).

ment. Her doctor at that time said that she was unable to provide for any of her own care, did not have the ability to make medical decisions, and was in need of a guardian and conservator. Sarah died July 29, 1996, at the age of 91, and Plaintiffs were appointed as personal representatives of her intestate estate. This suit was filed on August 16, 1996 by Plaintiffs individually, but they later filed an amended petition seeking relief individually as well as personal representatives of Sarah's estate. In its judgment, the trial court found that Sarah did not lack the necessary mental capacity to execute and deliver the deed in question; that Defendant did not cause Sarah to execute the deed by undue influence; that Sarah was not under the domination and influence of Defendant, that she was not of unsound mind and did not lack the mental capacity to execute the deed; that on the date of the deed she was not in feeble health, mentally weak or infirm or susceptible to being easily influenced; and that Defendant did not actively participate in procuring the deed or influence Sarah in executing it. This appeal followed.

In their first point on appeal, Plaintiffs contend that the trial court erred as a matter of law in finding that Defendant did not unduly influence Sarah to make the deed because they presented substantial evidence of a confidential and fiduciary relationship which entitled them to a presumption of undue influence, which Defendant did not rebut.

"A presumption of undue influence arises where the evidence adduced shows a confidential or fiduciary relationship coupled with evidence of facts and circumstances showing undue influence." *Bolin v. Anders,* 559 S.W.2d 235, 241 (Mo. App.K.C.1977). In looking for a fiduciary relationship, equity does not limit the circumstances under which it may be found but will look for those instances where a special confidence is reposed on one side with a resulting influence on the other. *Mahler v. Tieman,* 550 S.W.2d 623, 628

(Mo.App.St.L.1977). The question is always whether or not trust is reposed with respect to property or business affairs of the other. *Id.*

In the instant case, the evidence indicated that Defendant became progressively more involved in Sarah's business affairs over the years. Initially, he was paid for feeding her cattle, and, in addition, she later began paying him one-half of the gross proceeds of the cattle sales. There was also evidence that by the late 1980s Sarah was becoming forgetful and Defendant later assisted her by helping her take care of balancing her checking account, depositing her retirement and social security checks, and paying her bills. In fact, Defendant began keeping Sarah's banking records at his home. Defendant would write the checks out and Sarah would sign them, but her deteriorating eyesight sometimes made it difficult for her to see if she was signing the checks in the right place. Eventually, Defendant wrote checks and signed Sarah's name "by Donald," after explaining to the bank what he was going to do. When Defendant would deposit Sarah's checks for her, she would tell him to deposit it all except for $500, representing $300 he kept for feeding the cattle, and $200 which he would give Sarah so she would have cash.

In approximately 1990 or 1991, Defendant also fixed fence for Sarah, and paid for the materials with checks made out by her in blank that were filled in by him at the time of purchase. Cattle feed was also purchased by Defendant with checks signed in blank by Sarah. Defendant would go into Sarah's house daily to check on her and be sure the mail was taken care of. When Sarah had excess money in her checking account, Defendant would sometimes suggest that he authorize her to send it to Edna, which was done several times.

It is clear from the evidence here that a special confidence and trust was reposed by Sarah and also by Edna in Defendant

with respect to Sarah's business and financial affairs. In fact, the trial court did not find otherwise. A confidential relationship has been found to exist under similar facts. *See Lesh v. Lesh,* 718 S.W.2d 529, 533 (Mo.App. E.D.1986).

■ A confidential relationship, however, alone is not enough to raise a presumption of undue influence; there must also be facts and circumstances tending to show undue influence. *Bolin,* 559 S.W.2d at 241. "What is required is proof of facts from which an inference can arise that the undue influence was an active factor in the transaction." *Id.* In *Duvall v. Brenizer,* 818 S.W.2d 332, 335 (Mo.App. W.D.1991), the court said:

> In the case of a deed for land, the "presumption" is raised when there is a confidential relationship, a deed favoring the one acting in the fiduciary capacity, and some evidence "from which the Court can infer undue influence, ..."

The "presumption" referred to in the cases, and on which Plaintiffs seek to rely, is really a doctrine of permissible inference. *Matter of Estate of Soper,* 598 S.W.2d 528, 538 (Mo.App. S.D.1980). Since it is a rebuttable presumption, the question becomes one of fact for resolution by the trial court. *Id.*

■ "Undue influence itself is usually defined as 'such overpersuasion, coercion, force, or deception as breaks the will power of the testator or grantor and puts in its stead the will of another.'" *Duvall,* 818 S.W.2d at 335 (quoting *Hamilton v. Steininger,* 350 Mo. 698, 168 S.W.2d 59, 67 (1943)). It is necessary that the undue influence be operative at the time of execution of the deed sought to be set aside. *Wilkie v. Elmore,* 395 S.W.2d 168, 173 (Mo.1965). It is not "undue influence" for a defendant to exercise influence so long as it was not so coercive or importunate as to deprive the plaintiff of her free agency. *Id.*

■ The mental and physical condition of the grantor is "highly material" on the issue of undue influence. *Bolin,* 559 S.W.2d at 241. The trial court found that Sarah did not lack the necessary mental capacity to execute and deliver the deed in question; Defendant did not cause Sarah to execute and deliver the deed by undue influence; and that she was not in feeble health, mentally weak or infirm or susceptible to being led by attention and easily influenced on the date of the deed; and that the deed was not given without consideration. Plaintiffs, however, point to evidence which they argue was indicative of Sarah's mental debility, i.e., she went into a nursing home three years after the deed was executed and was diagnosed as having advanced dementia; she was not capable of managing her farm and financial affairs as of the time of the deed, and depended on Defendant to do so; and she was essentially homebound since she had not driven since 1990 and depended on Defendant for transportation. Dr. Goodman, her treating doctor when she was in the hospital and later the nursing home after a fall in 1995, testified she was diagnosed with dementia while at the nursing home. In response to a hypothetical question, he testified that in his opinion Sarah had at least stage two dementia as of 1990, two years before the deed was executed, but he was unable to quantify her condition in 1992, although he did say that the condition can gradually worsen over time. In response to other questions, Dr. Goodman said that a person with dementia "would be no more susceptible to influence from an outside source than anyone else, other than the fact that persons with dementia, regardless of the type, become dependent on certain routines and are more comfortable and operate more efficiently in stable routine environments." He also said that "[m]y opinion and observation is that patients with dementia, regardless of the type, are not generally susceptible to outside influences that would affect their ability to make judgments that they would not want to make."

Dr. Wolfgraham, a psychiatrist, examined Sarah's records and testified that in his opinion she had Alzheimer's disease as of September 1992, which was between stages two and three. He said that a person with that stage of Alzheimer's is not able to make logical choices and decisions; and that in his opinion, she did not have sufficient mental capacity to understand "the procedure" with reference to executing the deed; and that the existence of such Alzheimer's would not be apparent to someone conferring with her about the deed "who did not have certain significant index of suspicion of the person's limitation."

Although there was evidence that Sarah was forgetful, talked of things that did not happen, and did not care for her home or personal hygiene as she should, other evidence was to the contrary. For instance, in February 1992 the Missouri Department of Social Services, Division of Aging ("DSS") received a report that Sarah was living in filth and a dangerous home; she had several cats in the house; the house was infested with mice; some food in the house had rotted; and she was blind, confused and didn't realize her situation. The DSS made a visit to Sarah's home to investigate and found the report to be essentially false. The investigator reported that Sarah's eyesight was poor, and she was forgetful about some things which was consistent with her age, but that "she [was] definitely not confused." Sarah also told the investigator at that time that she intended to convey her farm to Defendant because Plaintiffs had no interest in the place and Defendant had been very helpful to her. In a follow up visit to Sarah in January 1993, she told the investigator that she had signed a deed to the property to Defendant "of her own free will and he did nothing to force her." She was aware, and reported to the investigator, that under the conveyance, she was entitled to live on the farm until her death. The

investigator concluded that "there is absolutely no evidence [Defendant] forced her or coerced her into deeding him the land."

The attorney who prepared the deed and was present when Sarah signed it also testified. He said that Sarah came to his office in August 1992 and requested that he prepare a "living trust" and a will which would permit her to retain her property during her lifetime and provide for its disposition on her death. She was able to identify various pieces of property which she owned, and gave him the names of her children and grandchildren. He had no indication during that conference that Sarah was not oriented as to time, place or person. After he prepared and sent the trust instrument to Sarah for her review, she contacted him and said that she did not like the trust because it was too complicated and used "[t]oo many big words." [2] Instead, she told the attorney that she wanted to convey the farm to Defendant but that she wanted to maintain control of it during her lifetime. The attorney noticed nothing unusual during that conversation. Later, Defendant went to the attorney's office to see if the deed was prepared. When it was prepared the attorney and his secretary met Defendant at his home and Defendant led them to Sarah's home. When they arrived Sarah greeted them and engaged in a conversation which the attorney indicated was normal for a lady of her age. Defendant stayed outside while the attorney, his secretary and Sarah went into her home where Sarah signed the deed. The attorney testified to nothing that would indicate that Sarah was not aware of what she was doing or that she was the subject of undue influence.

■ Other considerations concerning the issue of undue influence include whether the disposition of the property was "unnatural," the absence of consideration for

---

2. We note parenthetically that a lay person's conclusion that a trust instrument is too complicated and contains "[t]oo many big words" is not restricted to people of unsound mind, nor does that conclusion automatically categorize them as such.

the conveyance, and whether there was concealment of the existence of the transfer. *Bolin,* 559 S.W.2d at 241–42.

■ Plaintiffs argue that this deed constituted an unnatural disposition of Sarah's property. In the context of a will contest, an unnatural disposition has been described as "a bequest in which a testator, without apparent reason, leaves his or her estate, or a large portion of it, to nonblood heirs and excludes the natural objects of his or her bounty." *Needels v. Roberts,* 879 S.W.2d 550, 555 (Mo.App. W.D.1994). The natural objects of a person's bounty, at a minimum, are those persons described in the statute on intestate succession. *Id.* Obviously, by this standard, the deed in question was an unnatural disposition.

Additionally, as indicated earlier, the lack of consideration is a factor in determining whether there was undue influence. Here, the deed recited consideration of $100 and other valuable consideration, and the evidence indicated that the farm then had a market value of between $100,000 to $250,000. While Plaintiffs argue that the deed in question was without consideration, they provide no citation to the record on appeal in support of that contention. There was no evidence that the conveyance to Defendant had been concealed by him. In fact, Plaintiff's evidence was that in November 1992 Defendant told Edna that "[y]our mother gave me her farm."

■ As indicated, the proof to justify setting a deed aside must be clear, cogent and convincing. That phrase means that the court should be clearly convinced of the affirmative of the proposition to be proved. *Grissum v. Reesman,* 505 S.W.2d 81, 86 (Mo.1974). Evidence, to be clear and convincing, must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true. *Matter of O'Brien,* 600 S.W.2d 695, 697 (Mo.

App. W.D.1980). With that standard of proof in mind, there must be evidence of the actual exercise of undue influence which destroyed the free agency of the grantor. *Lesh,* 718 S.W.2d at 533. Mere suspicion or the opportunity to exercise undue influence is insufficient. *Id.*

Here, there was evidence from which the trial court could have concluded that there was a confidential relationship between Sarah and Defendant; that Sarah had some stage of dementia during the general time frame that the deed was executed; that Defendant had an opportunity to attempt to influence Sarah; and that Sarah executed the deed with little money being paid in return. There was no evidence demonstrating the actual exercise of undue influence, only that from which a suspicion of its exercise, or the opportunity to do so, could have been said to exist. The logic of Plaintiffs' argument is evident, but it relies on suspicion or the existence of the opportunity for there to have been undue influence. We are not persuaded that, under the applicable standard of proof, that the trial court erred as a matter of law. The first point is denied.

■ In their second point, Plaintiffs contend that the trial court erred "against the weight of the evidence and as a matter of law" by finding that on the date of the deed, Sarah was not of unsound mind, suffering from a mental defect or a lack of capacity, mentally infirm or susceptible to being easily influenced by Defendant because they "proved by clear, cogent and convincing evidence" that on that date she lacked the requisite mental capacity to convey the land to Defendant. While evidence before and after the date the deed was executed is relevant to a grantor's mental capacity to execute the deed on a given day, the issue is whether the grantor had the mental capacity to understand the nature of the transaction, to know the extent of her property, and to recognize the objects of her bounty. *Estate of Helmich v. O'Toole,* 731 S.W.2d 474, 478 (Mo. App. E.D.1987).

In support of this point, Plaintiffs argue that Sarah was 87 years old when she signed the deed in question, and that three years later when admitted to the hospital after a fall, she was in a state of disarray, disoriented, had mild atrophy of the brain, and diagnosed with advanced stage dementia. Following discharge from the hospital, she was admitted to a nursing home and diagnosed as suffering from dementia with impaired short and long term memory, and was unable to carry on a meaningful conversation. They also point to the testimony of two doctors who said that, based on a review of her medical records, Sarah was suffering from dementia in 1992, and that Dr. Goodman's opinion was that a person with that condition was unable to manage their own affairs. As indicated earlier, Dr. Goodman did give that testimony, but also said that he did not believe a person with dementia was necessarily more susceptible to being influenced in making decisions. Significantly, Plaintiffs' evidence did not focus on Sarah's condition at or near the time of the execution of the deed.

■ Plaintiffs understandably espouse this testimony. As indicated in our discussion of the first point, however, the trial court was not required to conclude that Plaintiffs' evidence was clear, cogent and convincing with reference to Sarah's condition in 1992 when the deed was signed. There was other significant evidence indicating that during the time in question, Sarah, although of advanced years, understood the nature of the deed, the extent of her property and the objects of her bounty. She discussed her desire to convey the land to Defendant with friends and the DSS representatives several months before the deed was signed. She also discussed the fact that she had signed the deed several months after doing so, and the testimony concerning those conversations indicate that she knew what she had done and it was consistent with her desires. In her discussions with the attorney who prepared the deed she discussed her children and the other property which she owned, and after deciding against a trust instrument he prepared at her request, directed him to prepare the deed which she ultimately signed.

Plaintiffs understandably focus on evidence of forgetfulness and other infirmities associated with advancing age. It has been said, however, that "[i]nstances of illness, imperfect memory, forgetfulness, physical and intellectual weaknesses associated with old age, and mental confusion are generally not sufficient evidence to invalidate a deed." *Thurmon v. Ludy*, 914 S.W.2d 32, 34 (Mo.App. E.D.1995). In the instant case, the evidence was not clear and convincing that Sarah lacked the mental capacity to make the deed when she did. The trial court did not err in that regard. Point two is denied.

■ Plaintiffs' third point is based on a claim that the trial court erred in allowing Defendant to introduce, through the testimony of witness Vernon Long, statements allegedly made by Sarah which were hearsay in violation of § 491.010(2). Section 491.010(2) provides in pertinent part:

> In any such suit, proceeding or probate matter, where one of the parties to the contract, transaction, occurrence or cause of action, or his agent in such matter, is dead or is shown to be incompetent, and the adverse party or his agent testifies with respect thereto, then any relevant statement or statements made by the deceased party or agent or by the incompetent prior to his incompetency, shall not be excluded as hearsay.

On cross-examination, Defendant, over Plaintiffs' objection, asked Mr. Long, a longtime friend of Sarah's, if Sarah had told him that she was going to leave the farm to Defendant. After Plaintiffs' hearsay objection was overruled, Mr. Long testified that Sarah told him that she wanted to leave her farm to Defendant, and that she wanted to stay there the rest of her life. Plaintiffs contend that neither they

nor their agents testified concerning that subject.

Prior to Mr. Long's testimony, Plaintiffs brought up the subject of whether Sarah had said that she intended to convey the real estate to Defendant. On direct examination from Plaintiffs' counsel, Edna testified, without objection from Defendant, that Sarah had never told her that she was going to convey real estate to Defendant. Plaintiffs also established during the direct examination of Sammy, without objection from Defendant, that Sarah had told him that she wanted to deed the farm to him.

■ An objection to the admission of evidence is waived where the same or similar evidence has been elicited or introduced by the objector. *Szasz v. Tella*, 984 S.W.2d 129, 132 (Mo.App. W.D.1998). *See also Dunn v. St. Louis–San Francisco Ry. Co.*, 621 S.W.2d 245, 252 (Mo. banc 1981), *cert. denied*, 454 U.S. 1145, 102 S.Ct. 1007, 71 L.Ed.2d 298 (1982), holding that the admission of evidence claimed to be hearsay is reversible error only if the complaining party is prejudiced, and the complaining party cannot be prejudiced by the allegedly inadmissible evidence if that party offers evidence to the same effect as the challenged evidence.

Additionally, we note that even if the evidence had been erroneously admitted in this court-tried case, such fact is rarely, if ever, a cause for reversal and then only when it appears from the record that the court relied on the evidence and that no other competent evidence supports the judgment. *Randall v. Eldridge*, 856 S.W.2d 381, 382 (Mo.App. E.D.1993). We are not directed to any portion of the record indicating that the trial court relied on the evidence in question here. Point three is denied.

In their fourth point, Plaintiffs contend that the trial court erred "by refusing to allow Plaintiffs to introduce evidence regarding [Sarah's] intent to deed the 120(sic) acre family farm to [Sammy]." They argue that the trial court allowed Defendant to introduce Sarah's oral statements relating to the disposition of the farm, but prevented them from introducing testimony relating to the existence of deeds signed by Sarah conveying the land to Sammy. Plaintiffs testified that they saw three deeds in Sarah's purse and her safety deposit box at various times in the late 1980s and in 1990. In the argument section of their brief under this point, they contend that the trial court erred in sustaining Defendant's hearsay and best evidence objections and not permitting Sammy to testify about the contents of those deeds. They acknowledge that the admission of evidence claimed to be hearsay is reversible error only if the complaining party is prejudiced, and the burden of establishing prejudice is on the complaining party. *Nettie's Flower Garden v. SIS, Inc.*, 869 S.W.2d 226, 230 (Mo.App. E.D. 1993).

■ Edna testified that she saw some deeds in Sarah's safety deposit box and later at her home. The trial court sustained Defendant's objections based on hearsay and best evidence when she was asked about the property described in them. No offer of proof was made concerning the rejected testimony. Under Rule 73.01(a) "cases tried without a jury," where "the evidence is ruled inadmissible, the court upon request shall take and record the evidence in full, unless it clearly appears that the evidence is not admissible on any ground or that the evidence is privileged." Here, neither a request that the court take and record the evidence, nor any type of offer of proof was made with reference to Edna's testimony. Generally, appellate courts do not review excluded evidence without a specific and definite offer of proof. *Collins v. Finley*, 886 S.W.2d 943, 945 (Mo.App. S.D.1994). As no offer of proof was made concerning Edna's testimony, this portion of the point is not preserved for appellate review. *Id.*

Sammy testified that in the late 1980s he went with Sarah to an attorney's office to discuss preparing "deeds" because she said

that she wanted to "[g]ive me the farm." He said that he later saw deeds in Sarah's purse. The trial court sustained Defendant's hearsay and best evidence objection concerning whether the deeds were signed. Plaintiffs then made an offer of proof through Sammy that the deeds were signed by Sarah, and that he was the grantee, and that "they" described the land in question in this suit. A review of the transcript indicates that the objection was to whether the deeds were signed. Sammy was not asked, except during the offer of proof, about whether the deeds described the land in question and named him as grantee. We are not directed to any portion of the record indicating that the information about which Plaintiffs complain in this point concerning Sammy's testimony was excluded by the trial court. Accordingly, this point is denied.

In their next point on appeal, Plaintiffs contend that the trial court erred in not permitting Dr. Wolfgraham to give his expert opinion about whether Sarah was, on the date of the deed, "of sufficient mind and memory to comprehend the nature and extent of her property and whether she comprehended the nature of the act of making and signing [the deed] to Defendant . . ." They argue that a sufficient foundation was laid for that testimony and that it was relevant.

Plaintiffs acknowledge that the determination of the admissibility of expert testimony is left to the sound discretion of the trial court. "A trial court does not usually commit reversible error by mere exclusion of expert testimony, even if the offered testimony is relevant and admissible." *Estate of Dean*, 967 S.W.2d 219, 224 (Mo.App. W.D.1998). Ordinarily, the exclusion of evidence will not be overturned unless it is an abuse of discretion. *Id.* An abuse of discretion occurs when the trial court's ruling is so arbitrary and unreasonable that it shocks the court's sense of justice and is clearly against the logic of the surrounding circumstances. *Id.*

Here, Plaintiffs called Dr. Wolfgraham to testify about his opinions following an examination of some of Sarah's medical records. He testified that he reviewed the records of her cataract surgery in 1989, and also the records in conjunction with her hospitalization after a fall in 1995. The trial court sustained Defendant's objections when Dr. Wolfgraham was asked by Plaintiffs whether he had an opinion with regard to whether or not on September 16, 1992 (the date of the deed) Sarah was of sufficiently sound mind and memory "to be able to comprehend the nature of her act when she signed" the deed, and whether she "was then and there of sufficient sound mind and memory to comprehend the nature and extent of her property." In an offer of proof, Dr. Wolfgraham gave his opinion that Sarah "was not of sufficient mental capacity to understand what she was doing, the rightful or appropriate recipients of her bounty, her property," and that "her mental function did not permit her to be able to evaluate what she was doing when she signed the deed." The trial court, in denying the offer of proof, said that he had permitted the doctor to give his opinion about her mental status in June 1989 and in 1995 based on his examination of the medical records, "[b]ut with respect to answering those specific questions as to her capacity on that day when she executed that instrument, I do not think he's had sufficient foundational testimony to issue that opinion and the objection is sustained."

Dr. Wolfgraham was permitted to testify that in June 1989 Sarah had dementia of the Alzheimer's type with disturbance in judgment, orientation, affect, memory and intelligence, and that it was an earlier stage of the same process which he believed she had in 1995 when hospitalized. He said that in 1989, Sarah was between stages two and three of dementia, and that it had progressed to stage three by 1995. Dr. Wolfgraham was permitted to testify that in his opinion, in September 1992, Sarah's condition would have been suggestive of stage three dementia based on the

irregular nature of her signature on the deed in question which demonstrated poor motor control, but that his opinion was that as of that time she was still between stages two and three. He also testified that in stage two dementia, a person's ability to reason would be limited and impaired, that such a person would not be able to be fully aware of their physical and mental "environment," that their judgment would not be effective, they would not be able to make logical choices and decisions, and they would have difficulty assimilating information from others about the making of logical decisions. He said that a person in stage two dementia would not be intellectually functional, would be submissive, and would do whatever someone directed them to do. He characterized such a person as childlike, and indicated that their actions would be those of a three to seven year old child. When asked his opinion about whether Sarah knowingly and intelligently executed the deed in question, Dr. Wolfgraham said that in his opinion "she was not of sufficient mental capacity to understand the procedure."

As indicated, the trial court has considerable discretion in admitting or rejecting expert testimony. Even assuming, without deciding, that the testimony about which Plaintiffs complain was admissible, however, it is clear from the record that Dr. Wolfgraham was permitted to give considerable testimony about his opinion of the mental capacity of Sarah during the years prior to and including execution of the deed in question. That testimony clearly conveyed his opinion that Sarah's reasoning and judgment were impaired, she did not have the ability to make choices and decisions, and she was not of a sufficient mental capacity to understand the consequences of her act when she signed the deed.

"Refusal to admit evidence does not constitute reversible error unless it would have changed the result reached." *Green v. Stanfill,* 641 S.W.2d 490, 492 (Mo. App. S.D.1982). We are unable to conclude that the testimony of Dr. Wolfgraham, about which Plaintiffs complain, would have reasonably changed the result here. Additionally, we note that a contention that a trial court rejected admissible evidence is not a ground for complaint on appeal in a court tried case. *Francka v. Francka,* 951 S.W.2d 685, 693 (Mo.App. S.D.1997). This is because on review, this court is required to consider admissible evidence which was rejected by the trial court and preserved for the record. *Id.* Here, as in *Francka,* the rejected evidence was largely duplicative of that which Dr. Wolfgraham was permitted to give and which was admitted, and would defeat a claim of prejudice. *Id.* at 694. This point is denied.

In their final point, Plaintiffs contend that the trial court erred by refusing to grant their motion to transfer the case to the probate division of the circuit court because after Sarah's death and the opening of her estate, their amended petition should have been treated as a discovery of assets proceeding within the exclusive jurisdiction of the probate division. In support, Plaintiffs argue that the inventory in Sarah's probate estate claimed that the land in dispute in this case was an asset of the estate. After the filing of that inventory and their amended petition in this suit, they filed a motion to transfer the case to the probate division for hearing as a discovery of assets case which was denied.

Section 473.340.1 provides, in pertinent part, that any personal representative, beneficiary or other person claiming an interest in property which is claimed to be an asset of an estate, or which is claimed should be an asset of an estate, may file a verified petition in the probate division of the circuit court in which the estate is pending seeking a determination of the title, or right of possession thereto, or both. It also provides that "[t]he petition shall describe the property, ... shall allege the nature of the interest of the petitioner and that title or possession of the property, or both, are being adversely

withheld or claimed." As pointed out by Plaintiffs, § 473.340.2 permits any party to a discovery of assets proceeding to demand a jury trial.

A discovery of assets action is a search for assets. *State ex rel. Knight v. Harman*, 961 S.W.2d 951, 954 (Mo.App. W.D.1998). It is a statutory proceeding similar to common law actions of trover or conversion, and its purpose is to determine whether the decedent held title at his or her death to certain described property and that the property is being adversely withheld by another person. *Id.* at 954–955. Determining whether an asset belongs to an estate is the purpose of a § 473.340 action. *Id.* (citing *In re the Estate of Halverson*, 840 S.W.2d 280, 284 (Mo.App. W.D.1992)).

A third party (Mr. Buschman) was appointed conservator for Sarah on July 1, 1996. Sarah died on July 29, 1996, a suggestion of death was filed in the conservatorship estate on August 5, 1996, and on the same day, Plaintiffs filed an application for letters testamentary in Sarah's estate. On August 16, 1996, Plaintiffs, individually, filed a "Petition To Set Aside Deed" in the circuit court of Maries County, in which they described the real estate and alleged that the deed in question was the result of undue influence by Defendant, and sought the order of the court setting the deed aside and adjudging title to be in them. On December 4, 1996, Plaintiffs were appointed personal representatives of Sarah's estate. On March 3, 1997, they filed a "First Amended Petition" individually and as personal representatives of Sarah's estate. The amended petition was verified, described the real estate in question, alleged that Defendant was in possession of that land, alleged that at the time the deed was executed Sarah was of unsound mind, and alleged that the deed was the result of Defendant's undue influence. Plaintiffs sought a judgment setting aside the deed, adjudging title to the real estate to be in Sarah, directing the delivery and transfer of the property to the personal representatives of Sarah's estate, for an accounting, and for a judgment for all "losses, expenses and damage."

On March 20, 1997, Plaintiffs filed a motion to transfer the case to the probate division of the circuit court of Maries County, alleging that their original petition was in the nature of a petition for the discovery of assets pursuant to § 473.340. That motion was denied by the trial court on July 18, 1997.

Plaintiffs cite *Chaney v. Cooper*, 954 S.W.2d 510, 519 (Mo.App. W.D.1997) for the proposition that a discovery of assets action is a special statutory proceeding over which the probate division of the circuit court has original and exclusive jurisdiction. In support of that proposition, *Chaney* cites *Brazeal v. Redburn*, 638 S.W.2d 771, 772 (Mo.App. S.D.1982). In *Brazeal*, this court held that under the 1978 amendment to § 473.340, proceedings to discover assets must be initiated in the probate division which, rather than the circuit court, had original and exclusive jurisdiction of such actions. *Id.*

The Missouri Supreme Court later decided *Jarman v. Eisenhauer*, 744 S.W.2d 780 (Mo. banc 1988), in which it emphasized the changes brought by the 1986 version of § 473.340. In comparing the later version with earlier versions, the Court said that the statute formerly limited the parties entitled to initiate proceedings for the discovery of assets, limited the type of property allegedly withheld, and also limited the proceeding to an effort to bring claimed assets into the estate. *Id.* at 781. It noted that the 1986 version of the statute was much broader and, by its provision that an authorized party "may" bring such a proceeding, is permissive rather than mandatory. *Id.* Consequently, the Supreme Court held that the circuit court had concurrent jurisdiction with the jurisdiction of the probate court in discovery of assets proceedings to determine the ownership of certificates of deposit, money

market certificates and jointly named securities. *Id.* at 782.

Plaintiffs attempt to distinguish *Jarman*, claiming that, unlike the present case, it involved a declaratory judgment action. A declaratory judgment action is not exclusively characterized as either equitable or legal, but its historical affinity is equitable and many equitable principles have been applied to such actions. *Cronin v. State Farm Fire & Cas. Co.*, 958 S.W.2d 583, 587 (Mo.App. W.D.1997). As indicated earlier, an action to set aside a deed is an equitable action calling into play the most extraordinary powers of an equity court. *Wingate*, 610 S.W.2d at 419. *See also Martin v. Norton*, 497 S.W.2d 164, 167 (Mo.1973). From this standpoint, declaratory judgment actions and suits to set aside deeds are not completely dissimilar. Accordingly, we hold that, pursuant to *Jarman* the circuit court had at least concurrent jurisdiction. This point is denied.

The judgment is affirmed.

PREWITT, J., and BARNEY, J., concur.