David PETEREIN, Anthony Peterein, Lucille Becker, John Peterein, Pauline G. Trunk, Daniel Peterein, Charles Peterein, and Christine Peterein, Respondents,

v.

Arthur J. PETEREIN and Nora Peterein, his wife, Appellants.

No. 51795.

Supreme Court of Missouri, Division No. 1.

Nov. 14, 1966.

Motion for Rehearing or to Transfer to Court En Banc Denied Dec. 12, 1966.

Earl R. Blackwell, Hillsboro, for respondents.

Brunson Hollingsworth and John L. Anderson, Anderson, Anderson & Brooking, Hillsboro, for appellants.

HOLMAN, Presiding Judge.

David A. Peterein, Sr. died intestate on November 8, 1962. His wife, Pauline, had died October 18, 1961. On July 24, 1959, David (then 76 years old) and his wife signed a deed which purported to convey to their youngest son, Arthur J. Peterein, and his wife Nora, approximately 324 acres of land known as the Oberle farm. The grantors reserved a life estate in all of the land except a tract of ten acres upon which the house was located. David was survived by six sons and three daughters. Eight of the children are plaintiffs herein and the ninth is defendant Arthur, whose wife Nora is also a defendant.

In this action plaintiffs sought to set aside the aforementioned deed because of the mental incapacity of David. The trial resulted in a judgment and decree setting aside the deed, and defendants have duly appealed.

David and his wife owned the Oberle farm as tenants by the entirety. It was appraised in 1962 at $30,000, and there was testimony that at trial time it had a value of $81,000 which, in part, resulted from the fact that it was near one of the few exits on Interstate Highway 55. David also owned a 175-acre farm upon which he had lived most of his life.

Harry Weier, an attorney of Hillsboro, testified that in 1956 David and his wife employed him to prepare their wills. In these wills the 175-acre farm was devised to their sons, David and Tony, and the Oberle farm was devised to the other four sons. Mr. Weier testified that deceased told him he and his wife couldn't agree on the wills and hence they were never executed. Mr. Weier further testified that Arthur came to his office in July 1959 and requested that he prepare the deed involved in this case; that Arthur came alone and instructed him as to the contents of the deed; that he had no contact with either of the grantors; that he prepared the deed and mailed it to Arthur and that Arthur later mailed it back to him and he had it recorded on July 25, which was the day after it was executed.

Linn Counts testified that he operated an automobile agency in Festus and was a notary public; that sometime in July 1959 he went with Arthur to his father's farm and notarized some papers; that Mr. and

Mrs. Peterein were sitting at the kitchen table in the family home and Arthur said, "Pop, I brought some papers for you to sign," and that Arthur "put it in front of the old man and the old man signed it"; that Mr. Peterein did not read the paper; that "they both signed the papers and I notarized them. I don't think we were there three minutes"; that he thought their daughter Christine was present at the time the papers were signed. This witness further testified that he did not read the paper and did not know what it was.

David Edward Peterein, a grandson of grantor, testified that he was an excavating contractor and often hauled dirt from the Peterein home place; that between 1955 and 1959 his grandfather had deteriorated mentally so that he often did not know the witness or his men; that in the summer of 1959 he dressed in heavy clothing like he would normally wear in winter; that he didn't know anyone; that he had given the witness permission to haul dirt earlier, but during that period would often run him off of the farm; that in 1959 his grandfather never appeared to be of sound mind and that about that time his grandmother had said to him, "I wish you would help look after Papa, he's not in his right mind any more."

Plaintiff John Peterein testified that he saw his father and mother almost every day; that in the middle 50's his father became confused and even doubted the integrity of the two sons who farmed the home place; that in August 1958 when his father was in the hospital he was irrational and thought the other patient in the hospital room was a crook; he complained that the streetcars kept him awake, although there were no streetcars operating near the hospital; that in May 1958, because his father had become so forgetful, some of the children designated Arthur to look after the father's business affairs and thereafter Arthur wrote the checks and took care of other business matters for his father; that when his father was in the hospital in May 1959 he was irrational and confused, and

after leaving the hospital became progressively more irrational and frequently wandered off and would get lost on his own farm; that his conversation would "drift off" from the subject. This witness further testified that a daughter, Christine, and son Daniel and Daniel's wife, took care of the parents; that his father had given Daniel two acres of land and Tony one acre upon which they built their homes; that he did not know about the deed to Arthur until after his father's death.

Gene Dollar, who apparently worked for grandson David, testified that he was at the farm a number of times in 1955, 1956, 1957, and 1958; that on some occasions David would know him and the next time he wouldn't; that in 1958 he would often run him off the farm without him getting the dirt he had gone for; that on one occasion in the summer of 1959 he had seen David and, "I stopped and talked to him and he was in a daze, he didn't even know me, he didn't even hear me."

Another son, Daniel, had always lived on the old home place. He testified that he saw his father frequently and helped care for him after he was discharged from the hospital in June 1959; that his father didn't know him all of the time, and sometimes thought his mother was his sister Christine, and vice versa; that from time to time he had seen Arthur bring papers for his father to sign; that Arthur would tell him to sign them and his father would do so without having received any explanation; that he had also heard Arthur tell his mother, in 1958, that there would be trouble with the government ASC unless the Oberle farm was "signed up" differently; that he did not learn of the deed to Arthur until after his father's death.

Plaintiff Tony Peterein testified that he had lived on the home place all of his life; that his father had given him an acre of land on which to build his house; that he and his brother David had farmed the home place and that he saw his father almost every day; that in the summer of 1959 his father

failed to recognize old friends, and "you couldn't hold a conversation with him"; that his father would get lost on the farm and on one occasion came into the barn where he was working and "stood around a little while and then he said, 'Can you take me home? I'm lost. I don't know where I'm at.'" This witness further testified that he had seen Arthur bring papers out from time to time for his father to sign and that his father would sign them; that he did not learn until after his father's death that the entire Oberle farm had been deeded to Arthur, although both Arthur and his mother had told him that the parents had deeded Arthur ten acres around the house.

Clark Berry, vice-president of Citizens Bank of Festus, testified that in May 1958, David A. Peterein, Sr. had signed a letter authorizing his son Arthur to sign checks on his account, and that thereafter the bank honored checks so signed by Arthur.

David was in the hospital on a number of occasions during the latter years of his life and the records of the hospitals were offered and admitted in evidence. The record of St. John's Hospital (St. Louis County) disclosed that David was in that hospital in August 1958 for a strangulated right hernia. The records show that he was also suffering from "arteriosclerosis—generalized; convalescence complicated by senile psychosis; * * * very combative and loud; appears to be confused at intervals." David was a patient in the same hospital in May and June of 1959. The records at that time show the following: "Encephalopathy due to arteriosclerosis; patient is mentally confused; senile type; very disoriented; * * * thought orderly was his son; wouldn't be convinced that it wasn't his son. * * * Hand restraints applied."

The records of Alexian Brothers Hospital show that he was admitted on December 9, 1959, troubled with retention of urine. The records also disclose the following: "Generalized arteriosclerosis, senile dementia. * * * Patient has been showing mental loss for the past 5 years * * *. Incoherent, uncooperative, restless, confused, disoriented. * * * No information is available from patient who is obviously a senile psychotic." The records further indicate that on two separate occasions Arthur signed a consent for an operation which stated that the reason it was not signed by the patient was that "he is mentally incompetent." It appears that David was in the hospital from December 1959 until April of 1960, and that over that entire period he had waist and ankle restraints at all times, and was confused, disoriented, and psychotic.

On the part of defendant, Lonnie Besand testified that he was a close friend of David and frequently serviced electrical appliances on David's farm; that he saw him about a half dozen times during the summer of 1959 and when asked about David's mental condition stated: "I can't come up with anything specific that would indicate anything wrong, however, there may have been."

Mr. Schumer, the father of defendant Nora Peterein, testified that he talked with David after the deed was made to Arthur and Nora, and David said he had given them the place because they wanted to build; that he didn't say how much land he had deeded to Arthur; that at that time he saw nothing unusual about David's conduct or conversation. This witness stated, however, that beginning about 1958 he could commence to see a difference in David; that he had spent several hours with him on the day (in October 1961) of David's wife's funeral (which David did not attend) and that on that day he talked and acted like a child.

The defendants also presented as a witness Dr. Curtis A. Meyer, the surgeon who operated on David in May 1959. This witness stated that the last time he saw David, in June 1959, it was his opinion that he was of sound mind. On cross-examination this witness admitted making the hospital record in August 1958 which indicated that

convalescence was complicated by senile psychosis.

Defendant Arthur was also offered as a witness but the court sustained an objection to his testimony based on the disqualification of the witness under the so-called Dead Man's Statute.

The trial court made the following specific findings of fact:

" * * * 4. That plaintiffs had no knowledge of the purported conveyance of the above described premises until after the death of the said David A. Peterein.

"5. That for some years prior to 1959, the said David A. Peterein had been suffering from a graduated loss of mental capacity; that during the spring of 1958, all parties plaintiff and defendant designated the defendant Arthur J. Peterein to handle all of the business affairs of the said David A. Peterein; said defendant thereby came into a fiduciary relationship with the said David A. Peterein; that said fiduciary relationship between defendant and the said David A. Peterein was created by the parties hereto because of the mental incompetence of said David A. Peterein to manage his business affairs.

"6. That the said David A. Peterein was thereafter hospitalized in August of 1958 and in May and June of 1959; that he suffered from generalized arteriosclerosis, delusions, confusion, disorientation, senility, and loss of mental capacity.

"7. That on the 24th day of July, 1959, and prior and subsequent thereto, the said David A. Peterein was mentally incapacitated; that the said David A. Peterein did not know or realize the extent of his property; that the said David A. Peterein was not aware of his relative heirs and their respective potential claims to his bounty; and that the said David A. Peterein did not understand or know the nature of the transaction when he placed his signature upon the instrument purportedly conveying the premises hereinabove described."

In our consideration of this appeal we deem it appropriate to state certain rules applicable in cases of this nature. The burden of proof was upon plaintiffs to prove by clear and convincing evidence that on July 24, 1959, David lacked mental capacity to understand the nature and effect of his act in signing the deed in question. Allen v. Kelso, Mo.Sup., 266 S.W.2d 696. "The law differentiates between the mental capacity required of grantor making a deed as a part of the arms-length business transaction and the mental capacity required when grantor is receiving but the satisfaction of heart and mind which comes from benefitting those near and dear to him. In the latter instance if he has sufficient mental capacity to know the extent of his property, his relatives and their respective claims on his bounty, the demands of the law have been satisfied." McCoy v. McCoy, 360 Mo. 199, 227 S.W.2d 698, 704. "The cancellation of a deed is the exercise of the most extraordinary power of a court of equity and this power ought not to be exercised except when clearly justified from a consideration of all the evidence in the case." Walton v. Van Camp, Mo.Sup., 283 S.W.2d 493, 500. "Appeals in equity cases such as this are heard de novo on the record as made below, the reviewing court determining the weight and value of the evidence, but usually deferring to the findings of the chancellor, especially where there is conflicting oral testimony involving credibility of witnesses, except when convinced that such findings are against the weight of the evidence." Been v. Jolly, Mo. Sup., 247 S.W.2d 840, 853.

We have concluded, after a careful review of all the evidence, that the weight of the evidence strongly supports the finding of the trial chancellor. We not only defer to his findings, but have independently arrived at the same primary conclusion, i. e., that on July 24, 1959, David did not have the mental capacity to execute the deed. We have heretofore stated the evidence in detail. It would be useless repetition to restate all of that evidence in

discussing the conclusion we have reached. We will, however, refer to a few items of evidence we have considered to be particularly persuasive.

We think it significant that because of David's mental condition the children, in May 1958, designated Arthur to handle his business affairs and that Arthur thereafter did so. We are also impressed by the testimony that David wore heavy winter clothing during the summer of 1959, and that he failed to recognize members of the family and others he had known for a long time; that, according to the testimony of a grandson, David never appeared to be of sound mind in 1959 and that his grandmother had told him that David "was not in his right mind anymore." The hospital records are convincing evidence that David had suffered definite brain damage and mental deterioration in that he was afflicted with arteriosclerosis, senile dementia, senile psychosis, and encephalopathy. In Dorland's Medical Dictionary, 23rd Edition, "senile psychosis" is defined as "one of the several forms of mental deterioration in old age in which the patient shows a tendency to confabulation, loss of memory of recent events, irritability and assaultiveness," and "encephalopathy" as "any degenerative disease of the brain." "Senile dementia" is a disease marked by progressive decay or deterioration of the mental faculties. Wharton & Stille's Medical Jurisprudence, Vol. I, § 975, p. 794. We note also that Arthur twice signed a consent for surgery to be performed upon David which stated that the patient did not sign because "he is mentally incompetent."

■ Although undue influence is not an issue, we think it proper to consider that Arthur did occupy a fiduciary relationship with his father and often presented papers to him for his signature; that David had no contact with the attorney who prepared the deed and there is no evidence that he read the deed or knew the contents of the paper he signed.

■ Defendants point to the fact that Dr. Meyer expressed the opinion that David was of sound mind in June 1959. We do not think that evidence should be controlling. The witness was a surgeon and was not shown to be particularly skilled on the subject of mental diseases. Also, we note that on cross-examination he admitted making a hospital record in August 1958 indicating that David was afflicted with senile psychosis.

■ Defendants also contend that plaintiffs' case must fail because there was no specific evidence that David was not mentally capable at the time and date the deed was signed. Although the notary said he saw nothing unusual about David during the three minutes he was in the Peterein home we do not consider that there was any convincing evidence on the subject of his mental condition which related to the specific time of signing the deed. As we have indicated, the evidence as to David's condition, both before and after the date of execution, was sufficient to warrant a finding that he did not have mental capacity to execute the deed on July 24, 1959.

■ We have read the cases cited in the briefs but they are of little value because each case, of necessity, must be decided upon its own facts, and we rarely find two cases where the facts are even substantially the same. Defendants rely primarily upon Cruwell v. Vaughn, Mo.Sup., 353 S.W.2d 616, Edinger v. Kratzer, Mo.Sup., 175 S.W.2d 807, and McCoy v. McCoy, supra, but each of those cases are distinguishable from the case at bar upon the facts. One important difference is that in each of those cases the grantor discussed the transaction in detail with the scrivener or notary on the day of execution, and the evidence concerning grantor's condition on that day indicated that he fully understood the transaction and was of sound mind at that time. That was not the situation here and we therefore do not consider that any of those cases are decisive.

■ The next point briefed by defendants is that plaintiffs should have been de-

nied the relief they sought because of laches. While the recording statute, § 442.390 (statutory references are to RSMo 1959, V.A.M.S.), gave plaintiffs constructive notice of the deed on July 25, 1959, we find that they did not have actual knowledge until after their father's death in November 1962. This suit was filed in July 1964. In regard to the defense of laches we have said that "Laches in legal significance, is not mere delay, but delay that works a disadvantage to another. So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law." Schaeffer v. Moore, Mo.Sup., 262 S.W.2d 854, 860. There is no contention that defendants suffered any substantial disadvantage from the failure of plaintiff to file the suit for about 20 months after the death of their father. Under the circumstances here presented, we rule that the defense of laches was not applicable.

The final contention of defendants is that the trial court erred in holding that Arthur Peterein (a grantee in the deed) was disqualified as a witness by reason of § 491.010, which provides, in part, that "in actions where one of the original parties to the contract or cause of action in issue and on trial is dead * * * the other party to such contract or cause of action shall not be admitted to testify * * *." After Arthur had been permitted to testify as to his name and address, that he was a son of David and a defendant in this action, an objection to further testimony, based upon the foregoing statute, was sustained. Defendants then made the following offer of proof: "Defendants offer to prove by Arthur Peterein the mental and physical condition of David Peterein, deceased, in July of 1959. Defendants further offer to prove by this witness that the deed in question was made for not only good consideration but for valuable and sufficient consideration in that the taxes on both pieces of property were paid during the year 1959 from personal funds of Arthur J. Peterein." The court sustained an objection to the offer.

 It is the contention of defendants that the court erred in sustaining the foregoing objections because a witness under the transactions disqualification is not disqualified for all purposes. They cite Birdsong v. Estate of Ladwig, Mo.App., 314 S.W.2d 471, wherein it is stated that "the witness would have been competent to testify as to matters which the deceased could not, if living, have refuted because they concerned things 'with which he had no connection and of which he had no knowledge.' " 314 S.W.2d 476. While Arthur may not have been disqualified for all purposes, we have no hesitancy in ruling that the statute disqualified him from testifying to the matters contained in the defendants' proffer and hence the court did not err in sustaining an objection thereto. See Hughes v. Renshaw, 314 Mo. 95, 282 S.W. 1014 [2], Wren v. Sturgeon, Mo.Sup., 184 S.W. 1036 [1], and Been v. Jolly, Mo.Sup., 247 S.W.2d 840 [10].

The judgment is affirmed.

All concur.