Rose Lee LANDERS, Densil Thomas
Boone and Patricia Ann Boone,
his wife, Respondents,

v.

Gary W. SGOUROS and G.W.
Maintenance, Inc.,
Appellants.

No. 27795.

Missouri Court of Appeals,
Southern District.

June 1, 2007.

Paul A. Kidwell, for Appellant.

Dale E. Nunnery, for Respondent.

ROBERT S. BARNEY, Judge.

Appellant Gary W. Sgouros ("Mr. Sgouros") and G.W. Maintenance, Inc. ("G.W."), an entity owned by Mr. Sgouros (collectively "Appellants"), appeal the trial court's judgment in favor of Respondents Rose Lee Landers ("Mrs. Landers"); Densil Thomas Boone ("Mr. Boone"); and Patricia Ann Boone ("Mrs. Boone") (collectively "the Boones").[1] The trial court's judgment set aside two real estate conveyances from Mrs. Landers to Mr. Sgouros made on March 17, 2005, on the basis that Mr. Sgouros and his companion, Lester Johnson ("Mr. Johnson"), unduly influenced Mrs. Landers to sell certain interests she possessed in 370 acres of land located in Butler County ("the Farm"). The trial court also determined Mrs. Landers was incompetent on the date the contract for the sale of her interest in the Farm was executed and the date the contract was closed. Additionally, the trial court's judgment restored to the Boones the interest they previously possessed in

the Farm and also entered judgment against Appellants in the amount of "$3,950.00 representing the monies paid for the cutting of the timber [from the Farm] less $500.00 paid by [Mr.] Sgouros for the purchase of the real estate." Appellants now raise four points of trial court error in this appeal.

A suit to set aside a deed is an action in equity. *Robertson v. Robertson*, 15 S.W.3d 407, 421 (Mo.App.2000). "The standard of review in a court-tried action in equity is that of a judge tried case: the trial court's judgment will be sustained unless there is no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or unless it erroneously applies the law." *Systematic Bus. Servs. Inc. v. Bratten*, 162 S.W.3d 41, 46 (Mo.App.2005); *see Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).[2] An appellate court should set aside a decree or judgment on the ground that it is against the weight of the evidence only if it has a firm belief that the decree or judgment is wrong. *Murphy*, 536 S.W.2d at 32. "When reviewing a court-tried case, we view all evidence and inferences in the light most favorable to the judgment and disregard all contrary evidence and inferences." *Ortmann v. Dace Homes, Inc.*, 86 S.W.3d 86, 88 (Mo.App. 2002). "We defer to the trial court's determinations as to the credibility of witnesses." *Id.*

Viewing the evidence in the light most favorable to the trial court's judgment, *Estate of Thompson v. Hicks*, 148 S.W.3d 32, 35 (Mo.App.2004), the record reveals that in 1989, prior to the transaction at

---

1. The record reveals that Mrs. Landers is Mrs. Boone's aunt. Mrs. Landers was 85 years of age when the transactions under consideration took place.

2. *Murphy* interpreted the provisions of former Rule 73.01(c). The provisions of that rule were transferred, in essentially the same form, to Rule 84.13(d) effective January 1, 2000.

issue, Mrs. Landers and her husband, Leslie W. Landers ("Mr. Landers"), transferred certain interests in the Farm to the Boones.[3] At some point in time after the 1989 conveyances, Mr. and Mrs. Landers became estranged from the Boones due to some type of family conflict. As a result of this falling out, Mr. and Mrs. Landers filed two separate lawsuits against the Boones in an attempt to have the 1989 conveyances set aside.[4]

Following Mr. Landers's death in 2003 and a subsequent car accident in which Mrs. Landers was involved, Mrs. Boone and Mrs. Landers "reconnected" and Mrs. Boone began to help her aunt attend to her personal affairs.

According to the testimony of Mr. Sgouros, in December of 2004 or January of 2005, Mrs. Landers made contact with her neighbor, Mr. Johnson, and discussed with him the possibility of selling the Farm. Mr. Johnson responded that he was not interested in buying the Farm. Mr. Johnson then contacted his friend, Mr. Sgouros, to see if Mr. Sgouros was interested in purchasing the property. Mr. Sgouros then contacted Mrs. Landers, who advised him that she wanted $150,000.00 for her interest in the Farm. Mr. Sgouros told Mrs. Landers he was interested in purchasing the property and had his attorney prepare a "Real Estate Purchase Contract" ("the Contract").[5]

On January 22, 2005, Mr. Sgouros and Mr. Johnson met Mrs. Landers at a highway intersection in Ripley County and she followed them to People's Community Bank in Doniphan, Missouri, to sign the Contract prepared by Mr. Sgouros's attorney. Mr. Sgouros and Mrs. Landers signed the Contract on that date. According to Mr. Johnson's testimony at trial, it was on that date that Mrs. Landers thought she was to receive her money for the sale of the Farm. Mr. Johnson testified at trial that Mrs. Landers "thought she was getting paid right then."

3. There was a dispute at trial as to exactly what interest was conveyed to the Boones; however, it was agreed that Mr. and Mrs. Landers retained a life estate in all of the land so conveyed. It appears that in two separate conveyances Mr. and Mrs. Landers conveyed a total of approximately 370 acres to the Boones. In each conveyance, one for 120 acres and a second for 250 acres, made on the same date, the Landers retained a life estate in the property conveyed.

The record also reveals that Appellants filed a counterclaim against Respondents and requested the trial court "try, ascertain, adjudge, and decree the title and interest of the respective parties ..." to the Farm. Appellants also prayed that once the rights and interests of the various parties were determined by the trial court, the court should order partition of the Farm. Due to its determination that the deeds representing the conveyances made by Mrs. Landers on March 17, 2005, should be set aside, the trial court did not declare the rights and interests of the parties to the Farm and denied Appellants' counterclaim, including their prayer for parti-

tion. Additionally, we note that Mr. Landers died in July of 2003 and Mr. and Mrs. Landers had no children.

4. The first lawsuit was dismissed by the trial court and the second lawsuit resulted in a judgment in favor of the Boones.

5. The Contract set out that Mrs. Landers agreed to convey to Mr. Sgouros all of her "rights and interests (including but not limited to [her] fee interest, present and/or remainder interest, to the entire property or to an undivided one-half interest in the real property, as the case may be, and [her] life estate in the real property)" as described in the two deed conveyances made by her and her husband in 1989 to the Boones.

The Contract also called for a purchase price of $150,000.00, which was to be reduced to $100,000.00 if Mrs. Landers could not "convey fee simple interest in the entire Property but can only convey an undivided one-half interest in the Property (whether a present interest and/or remainder interest) and [her] life estate in the Property...."

According to Mr. Sgouros, shortly after the mutual execution of the Contract, it was discovered in the course of a title search on the Farm that Mrs. Landers had only a life estate in the Farm and possibly an undivided one-half interest in 120 acres of the Farm. Mr. Sgouros testified at trial that he then called Mrs. Landers and told her he could not pay "a lot of money for [the Farm]." As a result, his attorney drafted an "Amendment # 1 To Real Estate Purchase Contract" ("the Amendment"), which reduced the purchase price to $500.00.[6] Mr. Sgouros admitted at trial that he did not discuss the Amendment with Mrs. Landers, but that he faxed a copy to Mr. Johnson, who in turn, placed a copy of the Amendment in Mrs. Landers's mailbox at the Farm. Mrs. Landers signed the Amendment, without benefit of counsel, on March 8, 2005, and Mr. Johnson then faxed the Amendment to Mr. Sgouros.

The closing of the real estate transaction took place on March 17, 2005. On that date, Mr. Johnson drove Mrs. Landers to the closing at a title company located in Poplar Bluff, Missouri, and waited outside while she made two general warranty deed conveyances to Mr. Sgouros. One deed conveyed "[a]ll of [her] undivided one-half interest in and to" 120 acres, as previously set out in the Amendment and in the Contract, and the second deed conveyed her "life estate interest only" in the *totality* of the 370 acres of land previously described in both the Contract and the Amendment.

Mrs. Landers was unrepresented at the closing. She received a check for $500.00 and then departed with Mr. Johnson, who took her home. Later, at trial, Mrs. Landers testified she thought she was to receive $44,000.00 at the time she executed her deed conveyances. She related, "They g[a]ve me a thousand that day, but they promised me forty-four." [7]

The record further reveals that prior to the closing, Mr. Sgouros notified Mrs. Landers's tenant in possession of the Farm that he was purchasing the Farm and that the tenant had to leave. Mr. Sgouros also indicated that Mr. Johnson was to be the manager of the property. The record shows that the tenant had been paying Mrs. Landers $2,400.00 per year to rent the property for pasture. Shortly thereafter, Mr. Sgouros directed that hay be cut on the Farm for which he received $600.00.

The record also shows that on March 22, 2005, Mr. Sgouros incorporated G.W. and on April 8, 2005, Mr. Sgouros and his wife executed a quit claim deed transferring their interest in the Farm to G.W. On April 8, 2005, Mr. Sgouros entered into a "Timber Stand Improvement Contract" with "Circle H. Sawmill, LLC," which provided that Mr. Sgouros would be paid "$100.00 per thousand board feet for the timber . . ." cut on the Farm. Testimony at trial revealed that pursuant to the terms of the timber contract, Mr. Sgouros could ultimately receive about $30,000.00 for the

---

6. The Amendment set out, in part pertinent to our analysis, that:

    1. The Property to be bought and sold is defined as the life estate of [Mrs.] Landers in the real property identified in Exhibit A and Exhibit B [i.e., the 370 acres of land previously described in the Contract] and the entire undivided one-half interest, whether vested or remainder, of [Mrs.] Landers in the real property identified in Exhibit A.

    2. The purchase price to be paid for the Property as defined herein is Five Hundred Dollars. . . .

7. In its judgment, the trial court found Mrs. Landers "received $500 for her interest in 370 acres of real estate. She thought it was a down payment on $44,000 that she was supposed to get."

timber cut on the Farm. After the first cutting, Mr. Sgouros was paid $3,950.00 pursuant to the terms of the "Timber Stand Improvement Contract."

Mrs. Landers filed a "Petition to Set Aside Deed" on May 5, 2005, which included a request for an injunction barring Mr. Sgouros from further harvesting timber on the farm. A "First Amended Petition" was filed on July 20, 2005, by Mrs. Landers along with Mr. and Mrs. Boone requesting the trial court set aside the deeds from Mrs. Landers to Mr. Sgouros. Respondents pleaded that Mr. Sgouros had represented to Mrs. Landers that

he would pay her the sum of Forty-four thousand dollars ($44,000.00) for her life interest in the real estate ... and that ... [he] failed to do so but only paid [Mrs. Landers] the sum of Five hundred dollars ($500.00). That the sum of Five hundred dollars ($500.00) actually paid by [Mr. Sgouros] for the conveyance of the real estate interest ... is totally inadequate as consideration for the conveyance of her interest in said properties.

The First Amended Petition also set out that Mrs. Landers was "induced to convey" the Farm to Mr. Sgouros; was "feeble in mind and body" at the time of the conveyance which "constituted practically all of the property possessed by [Mrs. Landers] at the time;" and was "without the benefit of independent advice ..." at the time of the conveyance such that she was unduly influenced to complete the transaction. Additionally, the First Amended Petition also alleged Mr. Sgouros committed waste on the farm by having the timber cut and requested an accounting for the value of the damaged trees. As previously related, Appellants filed a counterclaim seeking a determination of the parties' rights and interests in the Farm as well as partition of the Farm.

The trial court issued a preliminary injunction on July 21, 2005, which barred any further timber cutting on the Farm and a trial was held on January 5, 2006. At the close of all the evidence the trial court took the matter under advisement. On March 28, 2006, the trial court issued its "Findings of Fact, Conclusions of Law, and Judgment." In its findings, the trial court found that Mrs. Landers

was obviously feeble and weak of mind. She did not recall even being at the closing and at times she did not know who her own counsel was. She did not recall ever bringing suit against [Mr. and Mrs. Boone], whom she was involved in litigation with for several years. She had difficulty understanding questions. She would recognize her signature on documents, but would not recall signing them.

The court found that "[b]ecause of the degree of involvement by [Mr.] Johnson in the purchase of the property by [Mr.] Sgouros, the court finds that [Mr.] Johnson and [Mr.] Sgouros were acting in concert to effectuate the purchase of the property from [Mrs.] Landers." Further, relying on *Drake v. Greener,* 523 S.W.2d 601 (Mo.App.1975), the trial court found

based upon its own observation of [Mrs.] Landers at the hearing in this case and the testimony of [Mrs.] Boone that [Mrs.] Landers was not competent at the time of the real estate transaction in early 2005 to enter into the [C]ontract introduced into evidence at the trial and furthermore that the said [Mrs.] Landers was unduly influenced to enter into the transaction by [Mr.] Sgouros and [Mr.] Johnson, who were acting in concert to purchase the valuable property at far below its actual value.

* * *

[Respondents] carried their burden of proof with regard to the issue of compe-

tency. Consequently, the court is forced to conclude [Mrs.] Landers was not competent either on the date the [C]ontract was executed or the date the [C]ontract was closed.

\* \* \*

The evidence showed that [Mrs. Landers] was induced to execute the [C]ontract conveying her interest in 370 acres of land for the mere sum of $500.00. [Mr.] Sgouros quickly recovered his initial payment for the property by harvesting $600.00 worth of hay that was growing on the property. He then entered into a contract to cut the valuable timber from the land and was to receive $30,000.00 for his interests. The court finds that the little consideration of $500.00 that he paid is shocking compared to the actual value of the interest received by [Mr. Sgouros].... This court has found that a quasi-confidential relationship existed between [Mrs.] Landers and her long time friend and neighbor, [Mr.] Johnson, who was used by [Mr.] Sgouros to procure [Mrs.] Landers signature on the [C]ontract and who escorted her to signing of the [C]ontract and the closing of the real estate transaction. Furthermore, [Mr.] Johnson acted as a go between to facilitate the closing of this real estate transaction.

\* \* \*

[T]he disposition of [Mrs.] Landers interest in her property to [Mr.] Sgouros, a complete stranger, with very little consideration was a most unnatural disposition of the property. Moreover, [Mr.] Sgouros was operating on [Mrs.] Landers mistaken belief that conveying her interest in the property to him ... would somehow affect the interest of [Mr. and Mrs. Boone] to the property.... When looking at the transaction as a whole, the court considers the advanced age and physical and mental impairment of [Mrs.] Landers which made her susceptible to an exercise of undue influence. In addition, [Mr. Sgouros] had the opportunity to exercise his influence to cause [Mrs. Landers] to make an unnatural and unintended disposition of her property. The court further considers the active participation of [Mr. Sgouros] in preparing the contracts, deeds and the active participation by [Mr.] Johnson on behalf of [Mr.] Sgouros to secure the presence and signature of [Mrs.] Landers to effectuate the execution of the deed. These factors, coupled with the absence of bonified independent advice and the previously determined absence of valuable consideration, causes a classic case of undue influence and the court finds that [Respondents] have made their case. Accordingly, the court finds that the deeds resulted from undue influence.

The trial court ordered that the March 17, 2005, conveyances be "set aside and are considered void." It also ordered that Respondents recover judgment against Mr. Sgouros and G.W. for "$3,950.00 representing the monies paid for the cutting of the timber less $500.00 paid by [Mr.] Sgouros for the purchase of the real estate." This appeal followed.

Appellants raise four points of trial court error. Boiled down to their essentials, in their first three points relied on Appellants contend the trial court erred in setting aside the deeds to the Farm by determining: (1) Mrs. Landers was incompetent during the course of the entire transaction, because insufficient evidence supported this finding; (2) the entirety of the transaction resulted from undue influence, because the trial court misstated, misapplied and failed to apply standards of governing case law to the facts; and (3) the transaction resulted from undue influence, despite lack of substantial evidence

establishing either a fiduciary or quasi-fiduciary relationship between Mrs. Landers and Mr. Sgouros and/or Mr. Johnson. In Point Four Appellants assert the trial court erred in entering judgment against them for the value of the timber cut on the Farm in that the trial court misapplied the law and the judgment was not supported by substantial evidence. Appellants assert the Boones failed to prove harm to their reversionary interest and Respondents failed to establish the extent of their damage.

In our review of Appellants' first three points relied on we are guided by the following principles. "A deed procured by the exercise of undue influence is rendered invalid." *Pike v. Pike*, 609 S.W.2d 397, 402 (Mo. banc 1980). "The test is whether the grantor's free agency and voluntary action were thwarted." *Id.* "While neither direct testimony nor overt acts operating at the moment of the instrument's execution need be shown, the facts and circumstances from which undue influence can be inferred must be proved by clear, cogent and convincing evidence."[8] *Id.* at 402–03 (internal citations omitted); *see Lee v. Hiler*, 141 S.W.3d 517, 523 (Mo.App.2004).

"The cases recognize that undue influence is seldom susceptible of direct proof and that generally it must be deduced from the circumstances of the particular case." *Reeves v. Boone*, 591 S.W.2d 118, 121 (Mo.App.1979). "It is necessary that the undue influence be operative at the time of execution of the deed sought to be set aside." *Robertson*, 15 S.W.3d at 413.

Additionally, we observe that "[m]ental capacity and undue influence are ... intertwined. Both involve a state of mind and for that reason, feebleness and infirmity of intellect are facts to be considered in whether or not undue influence exists." *Farnsworth v. Farnsworth*, 728 S.W.2d 223, 227 (Mo.App.1986). "The grantor's mental capacity on the date of execution may be demonstrated by evidence of the grantor's condition before and after the execution." *Lee*, 141 S.W.3d at 523; *see Gifford v. Geosling*, 951 S.W.2d 641, 644 (Mo.App.1997). However, where, as here, one of the bases for setting aside a deed is the grantor's alleged lack of mental capacity, "[t]he burden is on the person seeking to set aside the deed to establish the grantor lacked mental capacity *at the time of the deed's execution*." *Thurmon v. Ludy*, 914 S.W.2d 32, 34 (Mo. App.1995). "While evidence before and after the date the deed was executed is relevant to a grantor's mental capacity to execute the deed on a given day, the issue is whether the grantor had the mental capacity to understand the nature of the transaction, to know the extent of her

---

8. In *Grissum v. Reesman*, 505 S.W.2d 81, 85–86 (Mo.1974), our Supreme Court set out that
     The term frequently used in equity cases, with reference to the required degree of proof, is 'clear, cogent and convincing' evidence. The courts have seldom stopped to analyze that term. As we now construe the phrase, it really means that the court should be *clearly convinced* of the affirmative of the proposition to be proved. This does not mean that there may not be contrary evidence. The word 'cogent' adds little, if anything; it means impelling, appealing to one's reason, or convincing.

"The trial court may be clearly convinced of the affirmative of a proposition even though it has contrary evidence before it." *In Re Estate of Dawes*, 891 S.W.2d 510, 523 (Mo.App. 1994). Additionally, the "requirement of an extraordinary measure of proof is not inconsistent with our standard of review, which is governed by ... *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976)." *Id.* at 522; *see Estate of Oden v. Oden*, 905 S.W.2d 914, 920 (Mo.App.1995).

property, and to recognize the objects of her bounty." *Robertson*, 15 S.W.3d at 415.

It is our view that the trial court's judgment, premised on undue influence and mental incapacity, has not been proven by clear and convincing evidence.[9]

■ Regarding the issue of mental capacity, it is clear that Mrs. Landers had not been declared legally incompetent by a court of law, neither was there any medical evidence which concluded she was incompetent. Alternatively, there was insufficient testimony by lay witnesses tending to show that Mrs. Landers was mentally infirm or mentally incapacitated. At most, Mrs. Boone testified that in the early months of 2005 Mrs. Landers's mental abilities "were not good." With that being said, Mrs. Boone acknowledged on cross-examination that she could not specifically say that in January of 2005 Mrs. Landers was incompetent.

As expected, Mr. Sgouros and Mr. Johnson testified that, in effect, Mrs. Landers knew what she was doing during the course of the entire transaction. Perhaps more telling, however, is the testimony of Mr. Boone. In response to the question of whether Mrs. Landers had been declared incompetent, Mr. Boone responded, "No, she hasn't." Mr. Boone also implied that Mrs. Landers had sufficient presence of mind such that she "wouldn't sell 370 acres for $500.00." When asked if Mrs. Landers felt that she had been swindled out of her real estate, Mr. Boone responded, "Well, I think that's the reason she brought the lawsuit. She thinks she was promised one thing and she just received another." Inferentially, we can conclude from these remarks that Mrs. Landers had an understanding of the extent and value of her real property.

■ Turning now to the findings of undue influence by the trial court, we note that "[a] presumption of undue influence arises where the evidence adduced shows a confidential or fiduciary relationship coupled with evidence of facts and circumstances showing undue influence." *Bolin v. Anders*, 559 S.W.2d 235, 241 (Mo.App. 1977). "A confidential relationship alone is not enough to raise the presumption of undue influence. There must also be facts or circumstances tending to show undue influence." *Id.*; *see Robertson*, 15 S.W.3d at 413.

■ "[I]t is not necessary to show that the defendant was present or was exerting his influence at the exact moment of execution." *Bolin*, 559 S.W.2d at 241. "What is required is proof of facts from which an inference can arise that the undue influence was an active factor in the transaction." *Id.* "Other factors or circumstances bearing on the court's finding of undue influence are many." *Id.* A grantor's mental and physical conditions are " 'highly material upon a consideration of the issue of undue influence.' " *Id.*

9. We expressly reject the proposition tendered in Appellants' second point relied on that the trial court also erred in its determination that this case is governed by *Drake*, 523 S.W.2d 601, an opinion from what is now the Missouri Court of Appeals, Western District. Appellants contend the trial court, instead, should have applied the law as set out in *Robertson*, 15 S.W.3d 407, which they assert is the controlling law in the jurisdiction encompassed by the Missouri Court of Appeals, Southern District. We note that there is but one Missouri Court of Appeals. MO CONST. art. V, § 1. Additionally, in *Pike*, 609 S.W.2d at 403, the Supreme Court of Missouri affirmed a trial court's judgment setting aside a deed conveyance on the basis of undue influence and expressly cited *Drake*, 523 S.W.2d at 606, as authority. Most recently, in *Millington v. Masters*, 96 S.W.3d 822, 832 (Mo.App. 2002), this Court approved of and applied the tenets set out in *Drake*, 523 S.W.2d at 606, in setting aside a quitclaim deed conveyance.

(quoting *Davis v. Pitti,* 472 S.W.2d 382, 387 (Mo.1971)). Indeed, "[e]vidence of the physical and mental condition of the grantor is relevant to prove his '*susceptibility* to the persuasion of undue influence.'" *Id.* (quoting *Salisbury v. Gardner,* 515 S.W.2d 881, 886 (Mo.App.1974)). "Another consideration that the courts consider relevant in determining the presence of undue influence is an unnatural disposition of property." *Bolin,* 559 S.W.2d at 241.

"In looking for a fiduciary relationship, equity does not limit the circumstances under which it may be found but will look for those instances where a special confidence is reposed on one side with a resulting influence on the other." *Robertson,* 15 S.W.3d at 412. "The question is always whether or not trust is reposed with respect to property or business affairs of the other." *Id.*

Here, Mrs. Landers testified she did not know Mr. Johnson "that well," but he had been friends with her husband. She stated that her husband "was in bed two years before he passed away and [she] kept him home and [Mr. Johnson] dropped by one time to see him and the next time he c[a]me by he brought [Mr. Sgouros]." She stated she never told Mr. Johnson she was interested in selling the Farm and Mr. Johnson probably "just thought because [Mr. Landers] had died that [she] would sell it." She stated that she "trusted Mr. Johnson. [She had] lived there by him for about twenty years." She also related the reason she signed the Contract without reading it was because she "trusted [Mr. Johnson]."

Mr. Johnson testified that he had been "a good friend" of Mr. Landers prior to his death and had lived by Mr. and Mrs. Landers for "[o]ver twenty years." He acknowledged Mrs. Landers trusted him and stated that she had reason to do so "[b]e-cause [he] wouldn't do [Mrs. Landers] wrong."

Mr. Johnson also testified that he had never read the Contract because he "wasn't concerned about it" and it was "not [his] action." He stated that he never explained anything relating to the transaction to Mrs. Landers and that he "just directed her to Mr. Sgouros." He related he was just "trying to facilitate a transaction between an old friend and new friend." He stated he has not been to Mrs. Landers's house since the day of the closing.

Mr. Sgouros testified that he had known Mr. Johnson for "eight or nine years," and Mr. Johnson put him in contact with Mrs. Landers in early 2005. Furthermore, Mr. Sgouros testified that on the day of closing, Mrs. Landers met Mr. Johnson at a grocery store in Fairdealing, Missouri, and Mr. Johnson took her to the closing. He testified that he did not know Mrs. Landers prior to this transaction; had never been in any type of fiduciary relationship with her; and was not related to her. He stated that although Mr. Johnson had known Mrs. Landers for a long time Mr. Sgouros did not think Mr. Johnson pressured Mrs. Landers to complete the transaction.

While the foregoing testimony of Mr. Johnson and Mr. Sgouros was discounted by the trial court, nevertheless, there is little in the record expressly showing that either Mr. Johnson or Mr. Sgouros coerced or unduly influenced Mrs. Landers into signing either the Contract or the Amendment. Additionally, there is little or no probative evidence tending to show that a confidential or fiduciary relationship existed between Mr. Johnson and Mrs. Landers or between Mr. Sgouros and Mrs. Landers. *See Mace v. Loetel,* 166 S.W.3d 114, 117 (Mo.App.2005).

As previously related, while there was evidence from which the trial court could possibly conclude there was, as the trial court terms it, a "quasi-confidential relationship" between Mr. Johnson and Mrs. Landers, it is clear that a "confidential relationship ... *alone* is not enough to raise a presumption of undue influence...." *Robertson*, 15 S.W.3d at 413 (emphasis added). Further, there is even less evidence creating an inference that there was a confidential relationship, a quasi-confidential relationship, or a fiduciary relationship between Mr. Sgouros and Mrs. Landers. Based on the foregoing we are persuaded, under the applicable standard of review, that "[t]here was no evidence demonstrating the actual exercise of undue influence, only that from which a suspicion of its exercise, or the opportunity to do so, could have been said to exist." *Id.* at 415. As such, except as previously noted, Appellants' Points One, Two, and Three have merit. However, the foregoing determination does not end our review of this case.

■ "Under the broad powers of a court of equity, and under the prayer for general relief by [Respondents in their First Amended Petition], these facts show combined theories by which we affirm the relief granted [Respondents]." *Coffman v. Coffman*, 414 S.W.2d 308, 312–13 (Mo. 1967) (internal citation omitted). Rule 55.33(b) provides:

[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues.[10]

See also *Pike*, 609 S.W.2d at 400. "When variance occurs without objection between pleading and proof, such variance, especially in court tried cases, shall be considered immaterial and the pleadings deemed amended to conform to the proof." [11] *Id.* "Here, though the proof supports the judgment declaring the deed invalid for reasons somewhat different than those propounded in the pleadings or the trial court's finding, it is clear the deed should be set aside," *id.*, because there was a mistake in fact when Mrs. Landers signed the Amendment and executed the deeds in favor of Mr. Sgouros for the mere consideration of $500.00.

■ Although "inadequacy of consideration is insufficient to warrant relief in the absence of other inequitable incidents, when a person is induced to part with an item of value for little or no consideration, 'equity will seize upon the *slightest circumstance* of fraud, duress, or mistake for the purpose of administering justice in the particular case.' " *Id.* at 403 (quoting *Drake*, 523 S.W.2d at 606) (emphasis added); *see Millington*, 96 S.W.3d at 832. In our analysis of the facts we are guided by

---

10. All rule references are to Missouri Court Rules (2006).

11. In *Rombach v. Rombach*, 867 S.W.2d 500, 506 n. 5 (Mo. banc 1993), the Supreme Court of Missouri observed that "[s]ome courts in this state have stated that before evidence that is admitted without objection will give rise to amendment of the pleadings by implied consent, the evidence must bear only on a new issue and not be relevant to an issue already in the case." "Other decisions imply a broader view." *Id. See also In re Care and Treatment of Johnson*, 161 S.W.3d 873, 875 (Mo. App.2005); *Vance Bros. v. Obermiller Constr. Servs.*, 181 S.W.3d 562, 564 (Mo. banc 2006). "We do not directly address this issue here." *Id.*

principles of equity, real estate and contract law.

"[W]here a grantor has been induced to execute a deed conveying something of value for little or no consideration, equity will grant cancellation if the conveyance was the product of fraud, duress or mistake." *Hay v. Kohl,* 902 S.W.2d 850, 852 (Mo.App.1995); *see City of Gainesville v. Gilliland,* 718 S.W.2d 553, 580 (Mo.App. 1986). We also note that "equity entertains jurisdiction to set aside a land conveyance to aid a party otherwise unable to obtain relief." *Lewis v. Barnett,* 694 S.W.2d 743, 746 (Mo.App.1985). "Parol evidence is admissible to show the actual consideration for the deed." *Cochenour v. Cochenour,* 642 S.W.2d 402, 406 (Mo.App. 1982). " '[C]ontractual provisions as to consideration to be paid by the purchaser are ordinarily not merged in the deed, and accordingly, evidence is admissible to show what consideration is to be paid although a deed has been accepted....' " *Don King Equip. Co. v. Double D Tractor Parts, Inc.,* 115 S.W.3d 363, 374 (Mo.App.2003) (quoting 77 Am.Jur.2d, *Vendor and Purchaser,* § 290). Tested by these principles, it is our view that Mrs. Landers was confused and mistaken as to the consideration she was to receive for the conveyances pursuant to the Amendment to the Contract.

"A unilateral mistake occurs when only one party has an erroneous belief as to the facts." *Matter of the Estate of Hysinger,* 785 S.W.2d 619, 624 (Mo. App.1990); *see Kassebaum v. Kassebaum,* 42 S.W.3d 685, 695 (Mo.App.2001). We recognize, of course, that

> [i]n this situation courts show a lack of sympathy for a claim that one party did not understand the consequences of an act and, in general, courts are very reluctant to allow one party or his representative to avoid a document or agreement for a mistake that was not shared by the other.

*Hysinger,* 785 S.W.2d at 624. "Although traditionally there has been reluctance to allow a unilateral mistake to avoid an agreement, this strict view has, in limited instances been softened, and a limited right of avoidance has been recognized." *Id.* "It has been stated that there may be relief by way of rescission for such a mistake when the other party knows of the mistake or it is so obvious that it should have been known." *Id.* "Recently, there has been a tendency to permit avoidance for a unilateral mistake when enforcement would be unconscionable and relief would impose no substantial hardship on the other party." [12] *Id.; see* Restatement (Second) Contracts § 153. Indeed, "[t]he Restatement recognizes that relief may be given for a unilateral mistake when (a) the effect of the mistake is such that enforcement would be 'unconscionable' or (b) the other party had reason to know of the mistake." *Id.* "While the distinction between a mistake of fact and a mistake of law is often blurred, it is generally recognized that there can be no relief for a mistake of 'law.' " *Hysinger,* 785 S.W.2d at 624.

---

**12.** An agreement is unconscionable if it involves "an inequality so strong, gross, and manifest that it must be impossible to state it to one with common sense without producing an exclamation at the inequality of it." *Peirick v. Peirick,* 641 S.W.2d 195, 197 (Mo.App. 1982). We also note that the concept of unconscionability is meant to protect "against onesidedness, oppression, or unfair surprise." *Ferry v. Ferry,* 586 S.W.2d 782, 786 (Mo.App. 1979). The determination of whether the agreement is unconscionable is considered "in light of the circumstances existing when the contract was made." *In re Estate of Weinsaft,* 647 S.W.2d 179, 182 (Mo.App.1983).

■ Here, while the evidence may support the proposition that Mrs. Landers made a mistake in law, the evidence also supports the proposition that she made a mistake in fact when she signed the Amendment which set out that she was to convey her interest in the Farm for $500.00. We agree with the trial court's conclusion that she believed the $500.00 she received at closing was a down payment on the total purchase price of $44,000.00.

■ In our analysis, we also note that the " 'law differentiates between the mental capacity required of grantor making a deed as a part of the arms-length business transaction and the mental capacity required when grantor is receiving but the satisfaction of heart and mind which comes from benefiting those near and dear to him.' " *Peterein v. Peterein*, 408 S.W.2d 809, 813 (Mo.1966) (quoting *McCoy v. McCoy*, 360 Mo. 199, 227 S.W.2d 698, 704 (1950)). " 'In the latter instance if he has sufficient mental capacity to know the extent of his property, his relatives and their respective claims on his bounty, the demands of the law have been satisfied.' " *Peterein*, 408 S.W.2d at 813 (quoting *McCoy*, 227 S.W.2d at 704). Therefore, as we review Mrs. Landers's actions in the instant matter, we discern that as a grantor of a deed for the conveyance of land in an arms-length transaction Mrs. Landers must have possessed a greater mental capacity than would be the case were she to have made a conveyance of land to persons " 'near and dear to [her].' " *Peterein*, 408 S.W.2d at 813 (quoting *McCoy*, 227 S.W.2d at 704). In our assessment as to whether Mrs. Landers made a mistake regarding the amount of money she was to receive for her interest in the Farm, we have not ignored the fact that Mrs. Landers was eighty-five years old at the time of the transactions at issue. The record reveals that within six months prior to signing the Contract and the Amendment, Mrs. Landers had been involved in an auto accident, the extent of which we are unable to discern from the record. Mrs. Boone testified that it was shortly after her car accident that Mrs. Landers called her and Mrs. Boone "took over and helped her out." Mrs. Boone also related that back in January, February, and March of 2005 Mrs. Landers's mental abilities "were not good." Additionally, Mrs. Boone stated that while Mrs. Landers could operate a motor vehicle "[s]he never dealt in real estate." As best we discern from the record, Mrs. Landers was not sophisticated in the matters of business. While the record shows her involvement as a party in two prior litigations involving the Farm, the record is devoid of a showing as to what role she played in that litigation.

Nevertheless, while of weakened mind and physical condition, the record also reveals that Mrs. Landers was not mentally incompetent in the sense of not being able to understand the value of the Farm. When questioned at trial as to how much she was being paid for her interest in the Farm, she related: "Well, I thought it was about two hundred dollars … an acre." She also said that Mr. Sgouros had promised her a total of $44,000.00 for her interest in the Farm. When presented with a copy of the Amendment at trial and asked whether she had agreed to sell the Farm for $500.00, she responded, "That's what they g[a]ve me, five hundred dollars …, and Mr. Johnson g[a]ve me five hundred. No, I got no more since that." She stated, "I asked him, he gave me the, huh, that little payment and I asked him when he was going to give me some more and he said about ten days."

Mr. Boone testified that Mrs. Landers's complaint was that "she had sold [the Farm] and the man wasn't going to pay

her." Further, Mr. Boone related that it was his understanding that Mrs. Landers "misunderstood what she was getting out of the property. [He did not think] it was ever[ ] explained to her." He related that Mrs. Landers "wouldn't sell 370 acres for $500.00," because "she is a smarter woman than that."

The record also shows that Mrs. Landers was receiving an income of $200.00 a month from her tenant, who rented a pasture from her. This monthly amount yielded a yearly income of $2,400.00 to which she, as a life tenant, was the sole beneficiary.[13] This fact, too, lends credence to the proposition that but for her mistake Mrs. Landers would not have conveyed all of her interest in the Farm for a mere $500.00 when she was receiving four times as much on a yearly basis for renting her pasture. Indeed, as an example of her level of confusion during the course of these transactions, Mr. Johnson testified that at the time of the closing, he acknowledged that Mrs. Landers "thought she was getting money that day...." When asked on cross-examination if Mrs. Landers had seemed confused at the closing "about getting the money," Mr. Johnson answered that "[s]he thought she was getting paid right then."

Another factor lending credence to the proposition that Mrs. Landers was mistaken when she conveyed her interest in the Farm for $500.00 is the profound similarities between the Contract terms and the Amendment terms relating to the consideration she was to receive. The Contract's terms provided for alternative payments to Mrs. Landers for $150,000.00, then $100,000.00 if she could only convey a lesser interest. Yet, using virtually congruent terminology in describing her interest in

the Farm, the Amendment provided for a consideration of a mere $500.00.

The Contract provided, in pertinent part, that for a purchase price for $150,000.00 Mrs. Landers would convey "all [of her] rights and interest (including but not limited to [her] fee interest, present and/or remainder interest, to the entire property or to an undivided one-half interest in the real property, as the case may be, and [her] life estate in the real property)...." This Contract amount was to be reduced to $100,000.00 if Mrs. Landers could not "convey fee simple interest in the entire Property but can only convey an undivided one-half interest in the Property (whether a present interest and/or remainder interest and [her] life estate in the property)...."

Then, the Amendment's terms provided, in pertinent part, that

1. The Property to be bought and sold is defined as the life estate of [Mrs.] Landers in the real property identified in Exhibit A and Exhibit B [i.e., being a total of 370 acres previously described in the Contract] and the entire undivided one-half interest, whether vested or remainder, of [Mrs.] Landers in the real property identified in Exhibit A.

2. The purchase price to be paid for the Property as defined herein is Five Hundred Dollars....

Mr. Sgouros's explanation as to why his offer for Mrs. Landers's interest in the Farm went from $150,000.00 to $100,000.00 and then to $500.00 was based on the fact that when the "title work came back she didn't own the farm." When asked if he had "purchas[ed] a life interest on three hundred seventy acres (370) of land" for $500.00, Mr. Sgouros answered, "Yes." He stated that in addition to the life interest,

---

13. This foregoing fact tends to discount Mr. Sgouros's remarks that Mrs. Landers sold all

of her interest in the land to somehow deprive the Boones of any benefit in the land.

he believed he had also purchased "a potential one half interest in one hundred twenty (120) acres of land . . . ."

The record also shows that Mrs. Boone, believed the Farm was valued at $500,000.00. She explained that there were 110 acres of bottom land on the river that "could be worth twenty-two hundred dollars . . . an acre," and the river land is "all pasture." She also related that 260 acres were in timber. When asked how much the Farm was worth per acre, Mr. Sgouros responded, "I would say maybe, it all depends if you look at the timber ground and field. I would say the field property would maybe be worth, the river property twelve hundred dollars . . . an acre and maybe the timber property four hundred dollars . . . an acre."

Recognizing that "equity will seize upon the slightest circumstance of . . . mistake for the purpose of administering justice . . . ," *Gilliland,* 718 S.W.2d at 580, and based on the extraordinary circumstances surrounding the entire transaction, it would be unconscionable not to permit Mrs. Landers to set aside the deeds at issue due to her unqualified mistake in executing the Amendment and deeds in exchange for the mere sum of $500.00 when she believed she was receiving $44,000.00. *See Hysinger,* 785 S.W.2d at 624; RESTATEMENT (SECOND) CONTRACTS § 153. We affirm that portion of the trial court's judgment setting aside the general warranty deed conveyances made by Mrs. Landers on March 17, 2005, and affirm that portion of the trial court's judgment restoring to the Boones the interest they previously possessed in the Farm.

We now take up Appellants' fourth point of trial court error. Appellants assert the trial court erred in entering judgment against them for the value of the timber cut "in that the trial court's decision misapplied the law and is not supported by substantial evidence because [the Boones'] reversionary interests were not harmed and Respondents did not establish the extent of their damage." In this respect we disagree and find that Appellants' fourth point lacks merit. However, this does not end our analysis. We determine Appellants are entitled to a measure of relief as set out below.

In the present matter, after setting aside the deeds conveying Mrs. Landers's interest in the Farm to Mr. Sgouros, the trial court, quoting *Davis v. Clark,* 40 Mo. App. 515, 521 (1890), set out that "[i]t has long been held . . . that a life tenant cannot cut timber except for firewood," and, as such, Appellants' contract to harvest timber from the Farm "is far in excess of the scope allowed a life tenant holder." Therefore, the trial court determined Appellants were required to pay Respondents, "according to their respective interests," the amount received by Mr. Sgouros under the timber contract.

Appellants maintain the trial court's reliance on *Davis,* 40 Mo.App. at 521, is misplaced because the "evidence presented at trial showed [the Farm] was not being harmed" and "cutting timber does not necessarily result in waste." In *Davis,* "the owner of the reversionary interest in certain lands of which defendant [wa]s the owner of the estate by the curtesy," brought suit against defendant "for waste by alleged injury to the inheritance in cutting trees." *Id.* at 516. The trial court sustained plaintiff's demurrer and plaintiff appealed. *Id.* On appeal, the court stated,

> [w]aste is that which does a lasting damage to the freehold or inheritance, and tends to the permanent loss of the owner in fee, or to destroy or lessen the value of the inheritance. In this country, where (at least until recent years) timber in many places is a hindrance to the enjoyment of the estate, whether it

be for life or in fee, the law is that cutting timber for the purpose of cultivation (if it did not lessen the value of the inheritance) is a privilege following a tenancy for life, when it was necessary for the proper and reasonable enjoyment of his estate, and as long as he only acts in so doing in conformity to good husbandry, regard being had to the situation of the country and the *comparative* value of the timber. But this is a privilege which can only be exercised for the purpose mentioned, *i.e.*, the proper enjoyment of the estate, which is hindered by the timber. So it has been held that the tenant cannot cut the timber merely for sale.

*Id.* at 517. Based on the foregoing, the appellate court reversed the matter with instructions to the trial court to permit testimony relating to waste. *Id.*

While *Davis* was authored well over a hundred years ago, it is still good law in the State of Missouri and has been cited as authority numerous times. The trial court's reliance on *Davis* is not misplaced.

Appellants also assert that "[w]hile the [t]rial [c]ourt did not specifically designate the theory under which this decision was made, the case was tried based upon waste by a life tenant." As such, Appellants maintain there must be evidence as to the value of the Farm before the timber cutting and the value of the Farm after the timber cutting. We disagree.

"In an action for waste, 'where the damage is small in comparison to the total value of the property and is readily ascertainable and where the verdict is not excessive, the amount of such damage may be arrived at by determining the cost necessary to restore the property to its former condition.'" *Lustig v. U.M.C. Industries, Inc.*, 637 S.W.2d 55, 58 (Mo.App. 1982) (quoting *Helton v. City of St. Joseph*, 340 S.W.2d 198, 199 (Mo.App.1960)).

Additionally, while we agree with the trial court that Appellants committed waste, it primarily affected the Boones' reversionary interest. Given the factual circumstances of this case, Mrs. Landers, as life tenant, was not entitled to a judgment against Appellants resulting from their having committed waste as to the Boones' reversionary interest in the Farm. Furthermore, "[a]s a general rule, rescission of a contract does not merely terminate it, but abrogates it in toto. Consequently, rescission of a contract involves restoration of the status quo of the parties, unless the parties have agreed otherwise." *Dilts v. Lynch*, 655 S.W.2d 118, 121 (Mo. App.1983) (internal citations omitted). Accordingly, Mrs. Landers should return the sum of $500.00 to Mr. Sgouros, representing the consideration she received for the rescinded deeds.

Therefore, that part of the trial court's judgment setting aside the March 17, 2005, general warranty deeds made by Mrs. Landers to Mr. Sgouros is affirmed. Additionally, that portion of the trial court's judgment restoring to the Boones the interest they previously possessed in the Farm is affirmed. Further, that part of the trial court's judgment ordering Mrs. Landers to return the sum of $500.00 to Mr. Sgouros is likewise affirmed. The remaining portion of the judgment awarding all Respondents the sum of $3,950.00 is reversed and remanded to the trial court for entry of a judgment awarding only the Boones the foregoing sum of $3,950.00 for waste committed by Appellants. Costs are to be assessed fifty percent against Appellants and fifty percent against Respondents.

GARRISON, J., and BATES, C.J., concur.